# THE PEOPLE OF THE STATE OF CALIFORNIA *v.* NOAH SCOGGINS.

IMPANELING JURY IN A CRIMINAL CASE.—Twelve names must be drawn from the box by the Clerk, and the defendant must be allowed to examine the whole twelve before exercising his right of peremptory challenge as to any; and those not challenged or excused must then be sworn; after which as many more names as will make up the deficiency must be drawn, when the same process must be repeated until the jury is completed. (SANDERSON, J., and SPRAGUE, J., dissenting.)

IDEM.—If a party omit to challenge a juror peremptorily until after he has been sworn, he may be permitted to do so, for good cause shown, at any time before the jury is completed, but not thereafter.

IDEM.—It is error for the Court to direct the Clerk to draw but one name at a time, and require the parties to examine him for cause, and interpose, if at all, a peremptory challenge before another name is drawn, and then direct him to be sworn to try the case.

THREATS AS EVIDENCE.—Threats made by the defendant are admitted for the purpose of showing malice, and thereby increasing the probabilities that he committed the offense.

THREATS BY THE DECEASED OR INJURED PARTY AS EVIDENCE.—Threats made by the deceased or injured party, if known to the defendant at or prior to the transaction, are admitted, for the purpose of showing that the circumstances of the offense were such as to excite the reasonable fears of the defendant that his life was in danger, or that he was in danger of serious bodily injury, and thus justify his act.

IDEM.—In a case of homicide where it is doubtful which party commenced the affray, threats made by the deceased are admissible on the part of the defendant, although unknown to him at the time of the homicide, as *facts* tending to illustrate the question as to which was the first assailant.

APPEAL from the District Court, Second Judicial District, Butte County.

The facts and the points and authorities of counsel are fully stated in the opinions delivered in the case.

*Cofforth & Spaulding,* for Appellant.

*Jo Hamilton, Attorney General,* for Respondent.

By the Court, CROCKETT, J.:

The defendant was indicted for the crime of murder, in the killing of one Joseph E. Lowery. On the trial in the District Court, in impaneling the jury the defendant claimed the right to have the names of twelve jurors drawn from the jury box, and to examine them all, as to their qualification to serve as jurors, before exercising his right of peremptory challenge as to any. But the Court directed the Clerk to draw from the box the name of one juror at a time, and required the defendant to examine and pass upon

each one so drawn, before another name was drawn, and each juror whose name was thus drawn, if found competent, and not challenged peremptorily, was ordered to be sworn as a trial juror before another name was drawn. The defendant excepted to this ruling, and relies upon it as error on this appeal.

Section three hundred and twenty-one of the Criminal Practice Act is in the following words :

" Trial juries for criminal actions shall be formed in the same manner as trial juries for civil actions'."

Section one hundred and fifty-nine of the Civil Practice Act prescribes the method of forming juries in civil actions, and is as follows :

" When the action is called for trial by jury, the Clerk shall prepare separate ballots containing the names of the jurors summoned, who have appeared and not been excused, and deposit them in a box. He shall then draw from the box twelve names, and the persons whose names are drawn shall constitute the jury."

If these were the only provisions touching the question at issue, it would be free from embarrassment. It would be evident that the defendant would be entitled to have twelve persons in the jury box before proceeding to examine any of them as to their qualifications. But section three hundred and forty of the Criminal Practice Act is as follows : " A challenge to an individual juror is either, first, peremptory ; or second, for a cause."

Section three hundred and forty-one : " It must be taken when the juror appears, and before he is sworn ; but the Court may, for good cause, permit it to be taken after the juror is sworn and before the jury is completed."

These provisions are apparently somewhat contradictory. If twelve names are to be drawn from the box, as required by section one hundred and fifty-nine of the Civil Practice Act, it is plain that in this action the District Court misconstrued the law, in ordering but one name at a time to be drawn, and requiring the defendant to pass upon it, before

another was drawn. On the other hand, the provision in section three hundred and forty-one of the Criminal Practice Act, to the effect that the challenge must be taken " when the juror appears, and before he is sworn," but for good cause may be taken *after he is sworn,* but, " *before the jury is completed,*" would seem to imply that each juror is to, be examined separately as he appears, and if not challenged, or rejected for want of the proper qualifications, is to be sworn before proceeding to impanel the remainder of the jury.

It is our duty so to construe these provisions as to harmonize them, if practicable, and at the same time to secure to the defendant in a criminal prosecution his right of challenge untrammeled by mere technical niceties.

Whilst it was intended by section three hundred and twenty-one to designate the general plan of forming a jury in a criminal action, as the same which prevails in civil actions, it must, nevertheless, be subject to such modifications as have been made by subsequent sections of the same Act. Section three hundred and forty-one was apparently intended to qualify, *pro tanto,* the previous section—three hundred and twenty-one. In a criminal action it is the duty of the Clerk, under the direction of the Court, as in a civil action, to prepare separate ballots containing the names of the jurors summoned, who have appeared and not been excused, and deposit them in a box, and to draw from the box twelve names, as required by section one hundred and fifty-nine of the Civil Practice Act. Thus far the proceeding is the same in criminal and civil actions. In a civil action each party has the right to examine the whole twelve before exercising his right of peremptory challenge as to any; and if some are excused for cause, the deficiency must be supplied with other names, who may in like manner be examined, until there shall be found in the box twelve men, whom the Court shall adjudge to be competent and qualified jurors; and thereupon each party may exercise his right of peremptory challenge. But neither can be required to exercise

it prior to this stage of the proceeding. The theory of the law probably is that the right to challenge peremptorily cannot be exercised so judiciously until the panel is filled with competent and qualified jurors, of whom each party is allowed to reject a certain number without assigning any reason therefor. But while this is the rule in civil actions, it is slightly varied in criminal actions, by section three hundred and forty-one of the Criminal Practice Act. Twelve names must be drawn, as in a civil action, and the defendant may examine the whole twelve before exercising his right of peremptory challenge as to any; and those not challenged or excused must then be sworn to try the issue, after which as many more names as will make up the deficiency must be drawn from the box, when the same process will be repeated until the jury is complete. In a civil action none are to be sworn until the jury is complete, and the peremptory challenge may be made at any time before the jury is sworn to try the issue. But under section three hundred and forty-one, in a criminal action, those not challenged or excused must be sworn at the time, and the same process must be repeated until the jury is complete. If, however, the party has omitted to make his challenge before a juror is sworn, "the Court may, for good cause, permit it to be taken after the juror is sworn and before the jury is completed." After the whole twelve are sworn and the jury is complete, no further challenge is permissible, even with leave of the Court. This variance between the methods of selecting juries in criminal and civil actions was probably dictated by the supposed necessity of placing the jurors in a criminal action under the control of the Court, during the process of forming the jury. In important cases, many days are often consumed in selecting a jury; and during this interval, it was doubtless deemed important to secure the jurors who had been accepted against improper influences, by placing them under the control of the Court; and hence the provision, in section three hundred and forty-one, that the challenge "must be taken when the juror appears, and before

he is sworn," unless, for good cause, the Court shall permit it to be taken after he is sworn, "and before the jury is completed." Under this construction of the statute the provision would appear to be ample to secure to the defendant an impartial jury. His peremptory challenge may be reserved until after he has examined the twelve jurors first presented, and exhausted his challenges for cause; and even after a juror is sworn, the Court may permit him to be challenged for good cause, at any time before the jury is complete. As an additional security, the juror must be sworn as soon as accepted, in order that the Court may thenceforth have him under its control so as to guard him against improper influences. It results from this view of the law that the District Court erred in requiring the defendant to pass upon each separate juror as his name was drawn, instead of directing twelve names to be drawn and permitting the defendant to examine each one before exercising his right of challenge as to any. In order to avoid all misconstruction on this important point of practice, we repeat that in a criminal action twelve names must be drawn from the jury box, and the defendant may examine each separately and exhaust his challenges for cause before challenging any one peremptorily. If he should accept, say six, and challenge six, those accepted must then be sworn, and six additional names must be drawn and presented for examination, with which the same process should be repeated, and so continued until the jury is complete.

On the trial another question was raised as to the admissibility of certain evidence offered by the defendant, and ruled out by the Court, under an exception by the defendant. The facts, as established by the evidence, were, that on the day of the homicide Lowery, (the deceased,) with his wife and two children, left his house, which is several miles distant from the residence of the defendant, with the intent to visit the town of Dayton; that after remaining at Dayton some hours he started to return to his home, and in doing so

went into a stubble field of defendant and broke down the fence for the purpose of allowing his hogs to enter the inclosure; that the defendant was present and resisted these proceedings, but was unarmed; that considerable angry discussion ensued, during which the defendant dragged the deceased from out the vehicle in which he and his wife and children were riding; that the deceased had on his person a pistol, which he had placed in his breast pocket the day before, never before then having been in the habit of carrying a pistol; that a scuffle ensued between the deceased and the defendant, during which one Crouch took the pistol from the deceased, but subsequently handed it to the wife of the deceased, after both had returned into the vehicle; that deceased then drove off, but shortly stopped again, and, rising up in an angry manner, threatened to tear down the fence and to shoot the defendant; that he then went off at a brisk trot for about a quarter of a mile, when he stopped, and again commenced to tear down the fence at another place; that the defendant then mounted a horse, and passing the deceased, went to a neighboring house, where he borrowed a shotgun, with which he returned to the place where the deceased last broke down the fence; that in the meantime the deceased had left and was driving away through the field; that the defendant pursued him, having the shotgun lying crosswise in front of him; that on overtaking him and coming within range he shot the deceased, who fell from the vehicle; that the pistol was found on the ground, near to the deceased, by those who immediately came to his assistance. The theory of the defense is, that as the defendant approached, the deceased raised the pistol in a threatening attitude, and was about to fire upon the defendant when he received the fatal shot, and consequently that the homicide was committed in self defense. One of the physicians who attended the deceased testified that "his right arm must have been raised, from position of shot, at time of receiving it." On the other hand, Mrs. Lowery, the widow of the deceased, testified that at the time of the fatal shot the pistol was lying

in her lap, with her hand resting upon it, and that it had not been out of her possession from the time when she received it from Crouch. On the trial the defendant offered to prove that a few days before the killing the deceased, in speaking of the defendant, had said "that Scoggins (the defendant) was a damn son of a bitch, and that he would kill him inside of ten days," and that on the very day of the homicide the deceased threw open the breast of his coat and exhibited a pistol to the witness, and said " he would make the son of a bitch of Scoggins (the defendant) bite the dust before night with this," referring to the pistol. It was admitted that these threats were not communicated to the defendant at any time before the homicide, and the proof, as stated at the time by counsel, was offered as tending to show the bitter enmity and feeling of the deceased toward the defendant at the time of the killing, and his purpose in having the pistol in his possession, and that it was his intention to use it on the occasion when he was shot; and as tending to prove the *animus* and intention of the deceased toward the defendant at the time of the homicide.

The evidence was excluded by the Court, and the defendant, having excepted, relies on this ruling as error. If the threats of the deceased had been communicated to the defendant before the killing, the evidence would have been clearly competent. A person whose life has been threatened by another, whom he knows or has reason to believe has armed himself with a deadly weapon for the avowed purpose of taking his life or inflicting a great personal injury upon him, may reasonably infer, when a hostile meeting occurs, that his adversary intends to carry his threats into execution. The previous threats alone, however, unless coupled at the time with an apparent design then and there to carry them into effect, will not justify a deadly assault by the other party. There must be such a demonstration of an immediate intention to execute the threat as to induce a reasonable belief that the party threatened will lose his life or suffer serious bodily injury unless he immediately defends himself against

the attack of his adversary. The philosophy of the law on this point is sufficiently plain. A previous threat alone, and unaccompanied by any immediate demonstration of force at the time of the rencounter, will not justify or excuse an assault, because it may be that the party making the threat has relented or abandoned his purpose, or his courage may have failed, or the threat may have been only idle gasconade, made without any purpose to execute it. On the other hand, if there be at the time such a demonstration of force as would induce a well founded belief in the mind of a reasonable person that his adversary was on the eve of executing the threat, and that his only means of escape from death or great bodily injury was immediately to defend himself against the impending danger, the law of self defense would justify him in the use of whatever force was necessary to avert the threatened peril. In such a case proof of the previous threat, and that it was communicated to the defendant, would be competent, as tending to show the *animus* of the party, and that the defendant acted upon a well grounded apprehension that his adversary was about immediately to put his threat into execution. But the question in this case is, whether or not previous threats of the deceased, *not communicated to the defendant*, were competent evidence for any purpose on the trial. In the case of *The People* v. *Arnold*, 15 Cal. 476, the same question, substantially, was before this Court. In that case Arnold was indicted for the murder of one Sweeny, and on the trial it was proved that when Sweeny was killed a pistol was found lying on the ground near to him; that he had borrowed the pistol a short time before, and had carried it on his person up to or about the time of the fatal rencounter. The witness who testified to these facts was asked by the defendant whether, at the time when Sweeny borrowed the pistol, he had said anything with reference to using it against the defendant. The District Court excluded the evidence on the ground that there was no offer to show that what was said by Sweeny was communicated to the defendant. This Court, however, held the evidence to be.

admissible on the ground that the proofs were conflicting as to whether or not Sweeny had used the pistol in a threatening or hostile manner toward the defendant immediately preceding the killing, and it was competent for the defendant to show, not only by direct, but circumstantial evidence, what that manner was; and that if Sweeny procured the pistol with the avowed intention to use it for assaulting the defendant, and thereby endangering his life, his declaration to that effect, made at the time, was a part of the *res gestæ*, and illustrative of the transaction. "It shows, in other words," says Mr. Justice BALDWIN, in delivering the opinion of the Court, "the purpose for which the weapon was procured. This leads us to the inquiry, whether the fact that A. procures a weapon for a particular purpose conduces at all to show, in a question of conflicting proofs as to the manner in which he used it, what that manner was. We apprehend that if a man goes into a house, borrows a gun, goes out with it, saying that he means to use it on another, and a rencounter happens between him and that other, and the witnesses who see the difficulty differ, or the circumstances are equivocal as to which one of the two commenced the affray, that some light might be thrown upon this question conducing to or toward its solution, by the proof of these facts as to A.'s procuring it, and his motives in doing so. The jury might, possibly, with some reason, conclude that, as the weapon was procured for this purpose of assault on another, that purpose was fulfilled; that the assault, in other words, was made in pursuance of the intended purpose when the weapon was procured, and especially if other facts in corroboration of this conclusion existed. It is true there would be nothing conclusive in this. But the fact of the conclusiveness of this proof to establish the proposition which it is introduced to prove is not the decisive question. The question is, whether this item of fact be a matter *proper to be considered* by the jury in arriving at their conclusion upon this mooted point. And we have no doubt that it is; that it may enter into the deliberations of the jury with all

the other facts as a matter to be weighed by them with the rest of the proofs."

We have made this liberal extract from the opinion because, in our view of the case, it expounds the law correctly. If a deadly rencounter occurs between two persons, in which one is killed, and if the survivor claim that he acted in self defense, the evidence of those who witnessed the transaction may leave it in doubt which of the two was the assailant. There may even be very slight proof that the deceased was the aggressor; and yet if it be established that, shortly before the affray, the deceased-armed himself with a deadly weapon, declaring, with apparent sincerity and earnestness, that he had procured it with a fixed determination to take the life of his adversary on sight, it cannot be denied that this would tend in some degree to corroborate whatever other evidence there was tending to show that the deceased was the assailant. Of itself, and unsupported by other facts, it might, and probably would, be deemed wholly insufficient to establish the fact proposed. Nevertheless, it would constitute an item of proof, tending, it might be slightly, but still in some degree, toward the conclusion proposed to be established. The weight to be attached to it is for the jury to consider, in connection with the other proofs; and it would be the duty of the Court to explain to the jury carefully that the proof was admitted only as tending to corroborate whatever other evidence there was that the deceased was the assailant, and for no other purpose.

It is alleged, however, that in this case there was an entire absence of proof that the deceased was the assailant, and that evidence of the previous threats ought not to be admitted, because there was, in fact, no proof whatever that the defendant acted in self defense. But, without attempting to analyze the proofs, it is enough for us to say on this point that Mrs. Lowery was the only witness immediately present at the time of the rencounter, and though she testifies that she had the pistol in her lap at the moment when her husband was shot, and had not parted with it from the time when

she received it from Crouch, it was for the jury to decide upon her credibility; and there was evidence tending to show that immediately after the affray the pistol was found upon the ground, not far from the deceased, after he fell from the buggy. One of the attending physicians also testified that from the position of the wound the right arm of the deceased must have been elevated when he received the fatal shot. We do not wish to be understood as intimating any opinion as to the weight to be attached to these facts, nor as expressing any doubt as to the credibility of Mrs. Lowery. These are matters for the jury, and we refer to them only for the purpose of showing that proof of the previous threats was not wholly irrelevant and impertinent.

In support of our views on this point, we refer also to *People* v. *Williams*, 17 Cal. 146, and *Dukes* v. *The State*, 11 Indiana, 566.

Judgment reversed and cause remanded for a new trial, and remittitur ordered to issue forthwith.

Mr. Justice Sanderson delivered the following concurring and dissenting opinion, in which Mr. Justice Sprague concurred:

I. The first point relates to the legal mode of forming trial juries in criminal actions:

When the case was called there was in attendance upon the Court a panel of thirty-six jurors, whose names, written upon separate slips of paper, were placed by the Clerk in a box provided for the purpose. The Court directed the Clerk to draw one name from the box, and then swear the person whose name should be drawn, to answer questions touching his qualifications. Thereupon counsel for defendant moved that twelve names be drawn from the box, and that the persons whose names should be drawn should all be sworn at the same time. This motion was denied, and the defendant excepted. The Clerk then drew from the box the name of

one J. H. Bells, who was sworn and examined as to his qualifications, and neither party having challenged for cause, the Court directed the defendant to exercise his right of peremptory challenge. Counsel for defendant objected to being required to exercise the right of peremptory challenge until a full jury had been called and had appeared in the box. The Court, notwithstanding, directed counsel to challenge the juror then or not at all. Counsel declined to exercise the right of peremptory challenge at that stage of the proceedings, and, thereupon, the Court directed Bells to be sworn as a juror to try the case; to all of which counsel for the defendant excepted. The same practice was followed as to each juror, accompanied by the same rulings and exceptions.

The provisions of the Criminal Practice Act, in relation to the formation of trial juries, are not in all respects consistent. Within itself that statute does not expressly prescribe the manner of forming trial juries, so far. as drawing and swearing constitute a part of the proceeding. Instead of prescribing in terms the mode of drawing and the manner and time of swearing them, it provides that "trial juries for criminal actions shall be formed in the same manner as trial juries in civil actions." (Sec. 321.) As to the manner of drawing the jury, as to the form of the oath to be administered to them, and as to the particular time or stage of the proceeding at which the oath is to be administered, the statute is silent, except as to an inference which will be noticed hereafter.

The mode of forming juries for the trial of civil actions, in the matter of drawing and swearing, is plain. It is as follows:

"When the action is called for trial by jury, the Clerk shall prepare separate ballots containing the names of the jurors summoned who have appeared and not been excused, and deposit them in a box. He shall then draw from the box twelve names, and the persons whose names are drawn

shall constitute the jury. If the ballots become exhausted before the jury is complete, or if, from any cause, a juror or jurors be excused or discharged, the Sheriff shall summon, under the direction of the Court, from the citizens of the county, and not from bystanders, so many qualified persons as may be necessary to complete the jury." * * * (Civil Practice Act, Sec. 159.) "As soon as the jury is completed, an oath or affirmation shall be administered to the jurors, in substance, that they, each of them, will well and truly try the matter in issue between ——, the plaintiff, and ——, the defendant, and a true verdict render according to the evidence." (Sec. 160.)

Under the foregoing provisions of the Civil Practice Act there can be no rational doubt as to the course to be pursued. The first act to be done by the Clerk is to take the panel returned by the Sheriff, so far as they have appeared and have not been excused by the Court, and copy the names upon separate ballots, which he then puts in a box provided for that purpose. When a case is called for trial by a jury, he is to draw twelve names from the box, and call them off as he draws them. The persons so drawn and called are to take their seats in the jury box. If there are not twelve ballots in the box, the Sheriff, under the direction of the Court, is to summon from the body of the county, and not from bystanders, so many qualified persons as may be required to complete the jury. When the jury box is full, and not before, counsel are to proceed to examine them touching their qualifications. All who are challenged, either for cause, if allowed, or peremptorily, are to retire from the box, and when the first twelve have all been examined, the vacant seats, if any, are to be filled in the same manner as at first, and so on till the jury is completed. When the jury is thus completed, and not before, they are to be sworn to try the case. Under this mode the defendent in a criminal action is enabled to preserve his peremptory challenges as long as he

CAL. REPS. XXXVII—87

pleases, and may use them at any time before the oath to try the case has been administered. (Crim. Pr. Act, Sec. 341; *People* v. *Jenks*, 24 Cal. 11.)

This mode is expressly adopted and made applicable to criminal actions by the three hundred and twenty-first section of the Criminal Practice Act, and there would be no question as to its compulsory application to criminal actions, but for the three hundred and forty-first section of that Act, which provides that challenges to an individual juror "must be taken when the juror appears and before he is sworn, but the Court may, for good cause, permit it to be taken *after the juror is sworn, and before the jury is completed.*" This provision certainly implies a mode of procedure materially different from that already described. It implies that each juror is to be called, examined, passed upon by counsel, and sworn to try the case, separately, in the manner which was adopted in the present case. It was in view of this provision that it was said in the case of *The People* v. *Reynolds,* 16 Cal. 129, that the course which was adopted in this case could be followed, but no reference was made to the three hundred and twenty-first section of the statute, which, so far as the case shows, was not called to the attention of the Court. Taking the three hundred and twenty-first section of the Criminal Practice Act, or, which is the same thing, the one hundred and fifty-ninth and one hundred and sixtieth sections of the Civil Practice Act together, it would seem that the Legislature has provided one mode for the formation of trial juries in criminal cases in *express terms,* and another by *necessary implication,* which, in its operation and effect, is quite different and less liberal to defendants than the first. If the statute is to be construed as authorizing either mode, *in the discretion of the Court,* the Court may direct the jury to be drawn and sworn as provided in civil actions in the case of A., and in the mode which is implied by the three hundred and forty-first section of the Criminal Practice Act in the case of B., who has been indicted jointly with A., and has demanded a separate trial; or, in other words, the Court

may accord most important privileges to A. and deny them to B. in the same case. I do not believe that the Legislature intended such consequences, and, in my judgment, the apparent result is due to that inadvertence which sometimes attends legislative action. But we must take the language of the Legislature as we find it; and the question is whether two modes, differing not in form merely but in substance, can be allowed in the discretion of the Court, and, if not, what course is to be followed? To hold that either mode may be adopted at the election of the Court, is to hold that the Legislature may do indirectly, or by the agency of a Court, what it is forbidden by the Constitution to do directly. All persons charged with murder stand in relation to the law in the same category, and the Legislature cannot confer, or permit to be conferred, upon one of them privileges which it denies, or permits to be denied, to another. (Const., Art. I, Sec. 11; *Brooks* v. *Hyde, ante.*)

I think there can be no question but that, under the clause of the Constitution which provides that "all laws of a general nature shall have a uniform operation," the Legislature is prohibited from passing laws which, of themselves, or at the discretion of those who are authorized to administer them, may operate in matters of essential right in a mode less beneficial to one person than to another who stands in the same relation to the law. There can be no question but that the Legislature is denied the power to pass a law which would allow to a defendant on trial for murder in the First Judicial District twenty peremptory challenges, and only ten in the Second District. For the same reason there can be no question but that the Legislature is denied the power to render, either by express direction or by a grant of discretionary power to the Courts, the right of peremptory challenge less beneficial to a defendant in one district than in another. Such laws would be repugnant to every man's sense of right and fair dealing, and hence, in adopting the Constitution, the people have agreed that the legal rights of all persons, standing in the same category before the law,

shall be governed by the same rule.   They have agreed that
no benefit or privilege shall be allowed to one which is not
allowed to all, under the same circumstances.   This funda-
mental principle is certainly violated by the Criminal Practice
Act, if it is to be read as authorizing or permitting, in the
discretion of the Courts, these two modes of forming trial
juries, for I am unable to distinguish between a statute
which, in terms, provides one rule for A. and another for B.,
and a statute which permits the Courts, in their discretion,
to select a jury in one mode for A. and in a different mode
for B., for in either case diversity, instead of uniformity,
is the result.   It is true, a uniform operation might be
secured by convention between the ministers of the law, but
I consider that the validity of the statute is not to be tested
by *possible* results which may be consistent with the Con-
stitution.   There would be no safety in such a rule, for there
are no means by which it could be enforced.   A statute which
*may be made* to operate diversely, by the ministers of the law,
is as vicious, in a constitutional sense, as one which does so
operate *ex proprio vigore.*

In what I have said I must not be understood, however, as
holding that a statute which prescribes different or alter-
native modes of procedure, in the discretion of the Courts,
by which the same object may be obtained, is, for that rea-
son only, unconstitutional.   Such, doubtless, is the case only
where some essential or material right is involved, which
may be lost or impaired by the one mode, while its full
benefit may be enjoyed by the other.   Where the variance
affects the mode and manner merely, without affecting the
right, it is not within the mischief against which this pro-
vision of the Constitution is directed.   Where the right may
be enjoyed with equal advantage and benefit by either mode,
the variance is, doubtless, of no moment in a constitutional
sense.   But in the present case the variance is one which
affects the right—the right of trial by jury—which includes
not merely a trial by twelve men, but a trial by twelve
*impartial* men, which, in turn, includes the right to have

them summoned by an impartial officer from the body of the county, to examine them as to their qualifications, to challenge them for cause, and, to a limited extent, without cause, except such as may exist in the breast of the party by whom the challenge is interposed. Without these incidents the right of trial by jury would become a delusion—a convenient engine of oppression, instead of a bulwark against it. In its freedom from bias and prejudice lies the chief excellence of the trial by jury, and to impair the means by which such freedom or impartiality can be secured is to impair the right itself, or, in other words, to accord to A. greater facility for securing an impartial jury than is allowed to B., under the same circumstances, is to enable A. to enjoy more beneficially the right of trial by jury than B., and, except in degree, is as vicious as it would be to accord a jury to A. and deny it to B. under the same circumstances.

That the mode provided in the Civil Practice Act affords greater facilities for securing an impartial jury than the mode which is impliedly authorized by the three hundred and forty-first section of the Criminal Practice Act, and which was adopted in this case, is obvious. The difference between the two affects the right of peremptory challenge, which can be more intelligently, and therefore more beneficially, exercised under the former than the latter. The right itself is inestimable. By it only, as a last resort, can bias and prejudice be excluded from the jury box. While its exercise must of necessity be confined to some reasonable number of jurors, of which the Legislature must judge, a denial of it altogether would greatly lessen the chances of obtaining an impartial jury, and therefore diminish, if not wholly jeopardize, the benefits which the trial by jury is designed to secure. If a defendant is required to challenge peremptorily each juror as he is separately called, without knowing who may succeed him, or not at all, he may be forced into the mischievous alternative of accepting a juror who is biased against him, or of taking the chances of having one still more objectionable take his place, or of exhausting his chal-

lenges upon jurors less objectionable than others whom he may be forced to accept; or, if he reserves his challenges for such jurors named in the panel as are most objectionable to him, they may not be called at all, and he may thus, practically, be deprived of all the benefits intended to be secured to him by the privilege of peremptory challenge, for, in thus being made to guard against a possible evil of greater magnitude, he may be made to accept a less, which might have been avoided had he been allowed to pursue a different course; or, in other words, a right which one is forced to exercise to a great degree in the dark, is emasculated by the mode to which its exercise is restricted. These consequences, if not entirely, are measureably avoided by the other mode. Instead of one only, whom he must accept or reject at his peril, the defendant has at all times twelve persons from whom he may select. Under such circumstances, if he cannot secure a jury altogether unobjectionable, his chances for obtaining the least objectionable jury afforded by the panel, are much greater, for he is enabled to distinguish between objectionable men, and to challenge the more, instead of the less objectionable. Thus it appears that the difference between the two modes is not of form merely, but of substance; for by the one mode the right of peremptory challenge is made available to the end designed in a much greater degree than by the other.

In view of these considerations, it is obvious that the statute cannot be construed as allowing these two modes *in the discretion of the Court*, without rendering it repugnant to the spirit, if not the letter, of the Constitution. But a construction which leads to such consequences must be avoided if possible. Were the two modes provided with the same exactness and precision, thus leaving no rational doubt but that the Legislature intended to allow alternative modes, it would be our duty, if possible, to construe the statute so as to avoid such a consequence. In such a case, perhaps, we could not declare in favor of one mode and against the other, for both would bear, with equal distinctness, the stamp of

the legislative will, and there might be, therefore, no rational ground for saying that one mode was intended, and not the other; and if in that case the statute could not be read otherwise than as allowing the *Court* to adopt either mode in its discretion, we might be compelled to declare it null and void. But even if such were the conditions, I should find, no difficulty in sustaining the validity of the statute. Read it as allowing a choice of modes to the *defendant* and not the *Courts*, and the statute is no longer repugnant to either the letter or the spirit of the Constitution, for it neither makes nor permits an unconstitutional distinction to be made between persons standing in the same relation to the law; but, on the contrary, maintains the same equality which would have existed had but one mode been provided—it neither confers, nor permits to be conferred, upon one person, a privilege or benefit which it denies or permits to be denied to another who stands in the same category, and does not, therefore, run counter to the uniform operation which is exacted by the Constitution.

But if we were cut off from this mode of escaping the consequence suggested, I should still find no difficulty in sustaining the statute. The Legislature has not, as just supposed, provided two modes with the same or equal exactness and precision, for one rests upon an express and direct provision, and the other upon a mere inference which is drawn from language which was employed upon a different, though cognate, subject. The two statutes—the Civil and Criminal Practice Acts—passed through the several stages of legislation *pari passu*, they were considered and reported to the Legislature by the same committees, and passed upon the same day. There was no reason why trial juries should not be drawn and sworn in the same mode in civil and criminal cases; much less was there any reason why the less beneficial mode should be adopted in criminal cases, if a distinction was to be made, for life, liberty, and character are more precious than lands and goods. If the same mode was to be applied to both, there was no occasion to particularly describe

it in but one of the statutes. Being described in one, a reference in the other would be all that could be required, and, accordingly, we find no express declaration of an intention to provide different modes, but an express declaration to the contrary, which is nowhere else directly contradicted. Under these circumstances, if it was necessary in order to uphold the statute, I should have no hesitation in declaring the true intent of the Legislature to have been, as stated in the three hundred and twenty-first section, to apply the mode described in the Civil Practice Act to criminal cases also, upon the ground that the mode there indicated is more clearly pointed out than the other, and is also founded upon the better reason and the larger humanity.

Upon this branch of the case my conclusion, which differs from that reached by a majority of the Court, is that a defendant in a criminal action is entitled, if he so desires, to have the jury drawn and sworn after the mode provided in civil cases, and hence that it does not lie in the discretion of the Court to adopt the mode which was employed in this case.

II. The next point relates to the exclusion of certain testimony as to threats which had been made by the deceased a short time before the homicide was committed, but which had never been communicated to the defendant. For the purpose of disposing of the present appeal a consideration of this point is unnecessary, but, as it will doubtless arise upon the new trial which must be granted, it is better that it should be considered now.

The case shows that the defendant offered to prove that five days before the homicide was committed the deceased came to the farm of the defendant in his absence, and declared to the witness that "Scoggins (the defendant) was a d—n son of a b—h, and that he would kill him inside of ten days;" also, that on the morning of the day on which the homicide was committed, at a place about five miles distant from the place at which the homicide was committed, the deceased, exhibiting a pistol to the witness, said "that he

would make the son of a b——h Scoggins bite the dust before night with this." In offering to prove these threats, counsel for defendant admitted that they had never been communicated to the defendant prior to the homicide, and, therefore, could not be received in evidence, upon the ground that they tended, in connection with other facts, to show that the circumstances of the homicide were such as to excite in the mind of the defendant the fears of a reasonable person that the deceased was about to commit a felony upon him, and thus justify the killing; but it was insisted that they were admissible for the purpose of sustaining the defendant's plea that the killing was in self defense, by showing probable grounds for the theory of the defendant that the deceased was the assailant, and was in the act of presenting his pistol at the defendant with deadly intent at the time the latter fired, and, therefore, that the homicide was justifiable. In view of the fact admitted by counsel that these threats were unknown to the defendant until after the homicide was committed, the Court below ruled that they were not admissible for any purpose.

It appears that there was some dispute between the deceased and the defendant in relation to the right of the former to pasture his hogs in certain fields which had been previously in the possession of the deceased, but which, at the time of the homicide, had come into the possession of the defendant, with the understanding, as claimed by the deceased, at least, that the hogs of the deceased should be allowed to run in certain stubble fields until the commencement of the rainy season. The defendant does not seem to have so understood it, but if he did, he was not disposed to carry out the arrangement. On the contrary, he seems to have turned the hogs out of the fields, and shut them out some time prior to the homicide. On the day of the homicide the deceased, with his wife and two little children, went to the fields in question in a two horse buggy —the deceased having armed himself with a pistol before

CAL. REPS. XXXVII—88

starting, which was quite contrary to his usual custom. Upon reaching the fields the deceased proceeded to knock down the fence so as to let in the hogs. While he was thus engaged the defendant came along, whereupon an altercation and personal encounter took place between them, in which the deceased was dragged from his buggy and thrown upon the ground by the defendant. The deceased seems to have made an effort to draw his pistol, and when the witness Crouch came up, the contest seems to have been mainly over the possession of the pistol, which was still in the pocket of the deceased. Crouch interfered and took possession of the pistol by common consent. Soon after the contest ceased, and the deceased returned to his seat in the buggy. Crouch gave the pistol to the wife of the deceased, upon her promise that she would not allow it to go out of her possession. During this time the parties had called each other liars and other hard names. The defendant insisted that the deceased must not tear down his fences, and the deceased threatening to tear them down as often as the defendant put them up, and, as he drove off, threatened to shoot the defendant, and to tear down the fences at four or five other places. The defendant replied "that if he intended to tear down more fence he had better take the woman and children home first." The deceased drove off some distance, and then again proceeded to tear down the fence. The defendant, remarking that he would not stand it, mounted a horse and rode after the deceased, whom he passed, and went to the house of one Davis, where he obtained a double barreled shotgun. By this time the deceased had turned his team in the direction of his home. The defendant followed and came up behind his buggy, when he fired his gun at the deceased, hitting him at the back of the right shoulder. No one, except the wife, saw what transpired at the time of the shooting. She testified that when the defendant rode up behind their buggy she turned and looked at him; that he was in the act of aiming his gun at her husband; that she put her hand upon her husband's shoulder and said:

"He is going to shoot you;" that her husband then turned around toward the defendant and immediately received the fatal shot; that the pistol was in her lap at the time, and that it had never been out of her possession from the time it was given to her by Crouch. The deceased fell out of the buggy; and there was some testimony tending to show that the pistol was picked up near the place where he fell. One of the medical witnesses gave it as his opinion that the right shoulder of the deceased was presented toward the defendant at the time of the shooting, and that his right arm was in a raised position, such as would have been its position had the deceased been engaged in presenting his pistol at the defendant at the time he received his death wound.

Such being the circumstances of the killing, it is claimed on the part of the defendant that the finding of the pistol at or near the place where the deceased fell, and the elevated position of his right arm at the time he received the defendant's shot, are circumstances tending to show that the deceased was himself the assailant, and was about to take the life of the defendant at the time the latter fired. That this theory would have been further established or fortified by proof of the threats which had been previously made by the deceased, and that the testimony in respect to those threats ought to have been received, as being of the same general character and effect as the finding of the pistol and the position of the arm, or as adding still another to the probabilities which tended to support and establish the theory of the defendant.

It is well settled that *threats, as such,* are admissible only in two cases: first, threats made by the defendant, which are admitted for the purpose of showing malice, and thereby increasing the probabilities that the defendant committed the offense; second, threats made by the deceased or the party injured, and *known* to the defendant at the time of the transaction, which are admitted for the purpose of showing that the circumstances of the killing were such as to excite the fears of a reasonable man that the defendant's life was

in danger, or that he was in danger of serious bodily injury, and thus justify the act. Unless they are *known* to the defendant at the time he acts, they can have no effect whatever to excite his reasonable fears, and cannot, therefore, be received for the purpose of showing that such was the case; but it has been argued with much ability and force that the purpose suggested is not the only purpose that can be subserved by such testimony; it being claimed that previous threats made by the deceased or injured party are *facts* or *circumstances* which tend to illustrate the question as to which party was the first assailant, and is of controlling weight in a doubtful case. The argument is that every fact or circumstance from which any rational presumption can be drawn by the jury, is relevant, however trifling its weight, and, therefore, must be received; that threats indicate malice, and the presence of malice affords rational ground for the act charged, especially in a case of conflicting testimony.

This view seems to be sustained by the case of *The People* v. *Arnold*, 15 Cal. 476. There the plea of the defendant was self defense, and it was claimed, on his part at least, that the testimony as to which party made the first assault was conflicting. In some respects the facts in that case and of this are alike. One Morris was a witness for the prosecution, and, among other things, testified that he was present when Sweeney (the deceased) was shot by the defendant; that immediately after the shooting the witness approached Sweeney, and saw lying on the ground, about six feet forward of him, a pistol which he had previously seen in Sweeney's possession, and which Sweeney had borrowed of one Cordes. Counsel for the defendant then asked the witness the following question: "At the time Cordes gave the pistol to Sweeney, was anything said by Sweeney with reference to using the pistol against Arnold?" To this question counsel for the people objected, upon the ground that the answer was irrelevant and incompetent. The Court below sustained the objection, upon the ground that what was said by Sweeney, as was admitted by counsel, had not been com-

municated to the defendant before the homicide. The admissibility of the supposed threats of Sweeney was urged upon the same ground which has been adopted in the present case. Among other things the Court said: "Generally speaking, whatever has a tendency to prove a material part of the issue is admissible. This proof may be direct or inferential, circumstantial or positive. It may be more or less conclusive, but if it be relevant, this want of conclusiveness is no bar to its introduction. The question in this case, as made by the prisoner, was the fact of the assault by the deceased; and in a conflict of proofs, the solution of this fact was or might have been dependent upon a variety of considerations; and these were to be passed upon, and the conclusions reached by the jury as the exclusive arbiters of this question. The defendant was entitled to urge all the considerations conducing to establish his theory, and to disprove that of the prosecution, which could be fairly presented to the jury. He had a right to urge as well expressly proven facts, as the probabilities and inference to be drawn from the conduct of the parties connected with the occurrence. He did urge, as we infer from the record, that this assault was not made by him, but that it was made by Sweeney; and to prove this he proposes to show that Sweeney had armed himself with this pistol, that he had borrowed it, and that it was found at the place of the rencounter. He was permitted to show these facts, but he proposed to show a further fact, and that was, that at the time of Sweeney's getting the pistol, he declared what he meant to do with it. This declaration, being made at the time of procuring the weapon, was a part of the *res gestæ*, and illustrative of the transaction. It shows, in other words, the purpose for which the weapon was procured. This leads us to the inquiry whether the fact that A. procures a weapon for a particular purpose conduces at all to show, in a question of conflicting proofs as to the manner in which he used it, what that manner was. We apprehend that if a man goes into a house, borrows a gun, goes out with it, saying that he means to use it on another, and a ren-

counter happens between him and that other, and the witnesses who see the difficulty differ, or the circumstances are equivocal as to which one of the two commences the affray, that some light might be thrown upon the question conducing to or toward its solution by the proof of these facts as to A.'s procuring it and his motive in doing so. The jury might possibly, with some reason, conclude that as the weapon was procured for this purpose of assault on another, that purpose was fulfilled; that the assault, in other words, was made in pursuance of the intended purpose when the weapon was procured, and especially if other facts in corroboration of this conclusion existed. It is true there would be nothing conclusive in this. But the fact of the conclusiveness of this proof to establish the proposition which it is introduced to prove, is not the decisive question; that question is whether this item of fact be a matter *proper to be considered* by the jury in arriving at their conclusion upon this mooted point. And we have no doubt that it is; that it may enter into the deliberations of the jury, with all the other facts, as a matter to be weighed by them with the rest of the proofs."

A like result was reached by the Supreme Court of Indiana in the case of *Dukes* v. *The State*, 11 Ind. 557.

Much the same question came before this Court in a late case—*Lyon* v. *Hancock*, 35 Cal. 372. Lyon and wife brought a civil action against Hancock for the malicious arrest of the wife. The defendant claimed that he had arrested Mrs. Lyon in good faith, believing that she had, on the instant previous to the arrest, maliciously thrown a brickbat through his window. The evidence that she had thrown the brickbat consisted of the fact only that she was the only person whom the defendant found in the street immediately after the brickbat was thrown. Such being the case, the defendant offered to prove ill feeling on the part of the husband toward him, and that he had made threats against him, as tending to show that she threw the brickbat. The Court below excluded the testimony, but we held that it ought to

have been received as relevant, though of little weight, to the question whether she threw the brickbat. Among other things we said:

"To ascertain the truth of facts in the absence of mathematical or absolute certainty, is to count opposing probabilities and determine upon which side lies the superior number. In computing the number, no rational probability on either side should be rejected. It matters not how trivial or unimportant it may seem when standing by itself, for when placed by the side of other probabilities, it may from relation become significant. Besides, under the head of relevancy, the question is not as to the weight of the evidence, but whether it tends at all to illustrate the issue.

"The presence of Mrs. Lyon in the street, and the absence of all other persons by whom the act might have been committed, were strong probabilities that the brickbat was cast by her. Taken in connection, does the fact, if such was the fact, that her husband entertained toward the defendant feelings of hostility, and had in her presence made threats against him, constitute another probability against her? Would she have been less likely to have cast the brickbat had the relations between her husband and the defendant been friendly? Or, in other words, guided by our observation and experience of the motives and relations by which human action is ordinarily influenced, can we affirm to a moral certainty that Mrs. Lyon could not have been influenced by the unfriendly relations existing between her husband and the defendant? It certainly is not contrary to human experience to find a unity of feeling and action accompanying the family relation. Feuds descend from father to son. An injury to one is an injury to all. The honor of one is the honor of all. It certainly is not contrary to human experience for the wife to sympathise with her husband, to share his feelings, to look upon his enemies or friends as hers also. Such are the teachings of our instincts, and of our observation and experience.

"Suppose, upon coming to the street, the defendant had found two women instead of one, of equal respectability and character—one of whom must have cast the brickbat—one the wife of his friend, the other of his enemy, would not the friendship of the one and the enmity of the other constitute probabilities to be taken into account in determining which perpetrated the act? Other probabilities being equal, as we have supposed, no one would hesitate to say that the act had been committed by the wife of the defendant's enemy, and not by the wife of his friend."

Between these cases and the present I can draw no distinction. If they were correctly decided, and I think they were, the Court below erred in this case. No fact or circumstance ought to be excluded from the jury, unless the Court is clearly satisfied that the jury can found no rational presumption upon it.

If the jury believe the testimony of Mrs. Lowery, they will, of course, pay no attention to these threats; but if there is any ground to doubt the accuracy of her testimony, they may, for the reasons given in the foregoing cases, look to these threats as affording some light, though dim, upon the question whether the deceased first assaulted the defendant.

Upon these grounds I concur in the judgment.