[Crim. No. 115.   First Appellate District.—January 9, 1908.]

## THE PEOPLE, Respondent, v. EUGENE E. SCHMITZ, Appellant.

CRIMINAL LAW—APPEAL—FILING AND SERVICE OF NOTICE—ORDER IMMATERIAL—ACKNOWLEDGMENT OF SERVICE.—Where the notice of appeal is filed and served on the same day, the order of filing and service, if contemporaneous, is immaterial; and where the district attorney has indorsed upon the notice of appeal filed an admission of "due service" thereof, he cannot, contrary to his written admission, claim that the service was invalid because made before the notice was filed.

ID.—TIME FOR APPEAL—RENDITION OF JUDGMENT.—An appeal may be taken in a criminal case under section 1239 of the Penal Code at any time within ninety days after the rendition of the judgment, and it is not premature because taken after the rendition of the judgment, and before its entry.

ID.—CONSTRUCTION OF PENAL CODE.—The provision in section 1240 of the Penal Code that the notice of appeal shall be filed "with the clerk of the court where the judgment or order appealed from is entered," cannot, whatever its meaning, be construed to deprive

the defendant of his statutory right to appeal when the judgment is rendered, whether then entered or not.

Id.—Error in Peremptory Challenge to Sworn Juror Without Cause Shown.—After jurors have been sworn to try the case. it was error for the court to permit the prosecution to challenge one of them peremptorily, without the showing of any cause therefor, as required in section 1068 of the Penal Code. Under that section the cause must be based on some fact, and founded upon a proper showing of facts upon which the court could have exercised its discretion.

Id.—Error in Sustaining Challenge for Implied Bias—Relationship to Defendant not Shown.—It was error to sustain a challenge for implied bias, for relationship by consanguinity or affinity of a juror to the defendant within the fourth degree, where no relationship was shown, and it appeared that the juror did not know the defendant, or know of any relationship to him.

Id.—Object of Code Provisions for Impaneling Jury—Fair and Impartial Trial.—The code provisions in regard to the impanelment of jurors, and their qualifications, have in view the right of the defendant to a fair and impartial jury, and not one picked and selected by the prosecution. The rights of a defendant should be carefully guarded at every step.

Id.—Appointment of Elisor to Take Charge of Jury—Right of Defendant to be Heard.—It was error for the court to order the appointment of an elisor to take charge of the jury, for disqualification of the sheriff and coroner, upon *ex parte* affidavits of the prosecution to such disqualification, and to refuse to allow the defendant to be heard as to the fact of the disqualification of the sheriff and coroner, and also as to the disqualification of the elisor by reason of bias and prejudice against the defendant.

Id.—Charge of Extortion—Hearsay Evidence.—Upon the trial of a charge of extorting money from witnesses for the prosecution, keepers of French restaurants, to secure liquor licenses for them, which had been previously withheld, it was error to allow such witnesses to testify to hearsay evidence, consisting of conversations between them in the absence of the defendant and his codefendant, as to the necessity of employing the codefendant, and the amount of money to be paid him, and the proportion of each. Hearsay that is injurious to a defendant is ground for reversal.

Id.—Improper Cross-examination of Defendant—Foundation for Rebuttal—Evidence for Prosecution in Chief.—It was error for the court to allow the defendant to be cross-examined as to the receipt of money from his codefendant that had been obtained from the French restaurant-keepers to secure liquor licenses for them, concerning which the defendant had not testified in chief, for the purpose of laying an improper foundation for rebutting evidence, which was properly part of the case for the prosecution in chief.

ID.—IMPROPER LIMITATION OF CROSS-EXAMINATION OF CODEFENDANT.— Where the codefendant had withdrawn his plea of not guilty, and had pleaded guilty to the charge of extortion, and had testified in rebuttal that he had paid part of the money to the defendant, which he had received as a fee from the French restaurant-keepers, his testimony as a confessed accomplice was not sufficient to convict the defendant without corroboration; and it was error to limit his cross-examination so as to exclude the right of the defendant to investigate every motive, statement and act on his part, or any other matter that might in any reasonable way have influenced his testimony, such as the inquiry whether he had not received a promise of immunity for his testimony, and other inquiries bearing upon his innocence of crime, and upon that of the defendant. The broadest scope of cross-examination should be allowed in such cases.

ID.—INSUFFICIENCY OF INDICTMENT FOR EXTORTION.—An indictment for extortion alleged to have been committed by unlawfully and feloniously extorting from the parties named in the indictment, with their consent, a specified sum, by the wrongful use of fear, induced by threats to do an injury to the property of the parties named, alleged to be restaurant-keepers, engaged in selling at retail liquors therein, for which they were required to have a license necessary to the profitable maintenance of said business, which the defendants well knew, and that defendants then and there unlawfully, feloniously, corruptly and knowingly threatened the said parties named that unless they paid them the said sum, and one year thereafter a further sum, the said parties could not, and would not, obtain said license, and that the said defendants would prevent them from carrying on or conducting said business of selling liquors at retail, is not sufficient to state the crime of extortion, because it does not allege or show that the specific injury threatened was an unlawful injury to the property of the person threatened.

ID.—CONSTRUCTION OF STATUTE—"UNLAWFUL INJURY."—In the phrase "threat to do an unlawful injury," etc., as used in section 519 of the Penal Code, providing that "fear such as will constitute extortion may be induced by a threat within, (1) to do an unlawful injury to the person or property of the individual threatened," the word "unlawful" qualifies the injury and not the threat, and imports an injury which is contrary to law or prohibited by the law of the state. To procure money by threat to do a lawful act is not a crime under the statute, whatever moral wrong there may be in obtaining the money.

[BY SUPREME COURT ON APPLICATION FOR HEARING IN BANK.]

ID.—EXTORTION BY THREAT TO DO UNLAWFUL INJURY TO PROPERTY.— To constitute the crime of extortion committed by means of any threat to injure property of the person threatened, the injury

threatened must be in itself unlawful, irrespective of whether or not the purpose with which the threat is made is to obtain money to which the person threatened is not entitled.

ID.—"UNLAWFUL INJURY" AN ACTIONABLE WRONG.—Giving to the term "unlawful injury" the broadest meaning possible under the authorities, it can include no injury that is not of such a character that if it had been committed as threatened, it would have constituted an actionable wrong, for damages suffered, or a threatened wrong which could be enjoined in equity if the remedy at law was inadequate.

ID.—LIQUOR LICENSES—POWER OF POLICE COMMISSIONERS—LEGITIMATE PERSUASION—MOTIVES IMMATERIAL.—It is within the lawful power of the police commissioners of San Francisco to withhold liquor licenses from keepers of restaurants therein, no matter how great the pecuniary loss thereby caused to their business; and it is also lawful for anyone by legitimate persuasion or argument, where no unlawful means are used to that end, to endeavor to persuade them to refuse the licenses, even though he may be actuated by the malicious intent to injure the restaurant-keepers, and cause them pecuniary loss.

ID.—SUFFICIENCY OF INDICTMENT FOR EXTORTION IN RELATION TO LIQUOR LICENSE—LANGUAGE OF STATUTE INSUFFICIENT—UNLAWFUL MEANS. In an indictment for extortion it is not sufficient to use the language of the statute; and under a charge of extorting money to do an unlawful injury to the business of restaurant-keepers, by withholding liquor licenses necessary to the conduct of their business, it is necessary to show that unlawful means would be used to prevent the same, if the money exacted were not paid.

ID.—USE OF UNLAWFUL MEANS OR UNDUE INFLUENCE NOT PRESUMED. It cannot be presumed, in the absence of any averment, that unlawful means or undue influence would be exercised over the police commissioners to prevent the liquor licenses necessary to their business, if the money exacted were not paid. The court cannot assume, in the absence of any averment to that effect, that defendant Schmitz was mayor of the city, and in a position to exercise power and undue influence over the members of the board of police commissioners, or that Ruef, his codefendant, was in practical control of the city government because of his political activity and influence, or otherwise able to exert an undue influence over the board, or that the use of unlawful means or undue influence was threatened, or that the purpose and ability to use such means successfully were perfectly understood by the parties concerned, because of the circumstances known to them.

ID.—ABSENCE OF EXPRESS THREAT—PLEADING OF FACTS.—The absence of an express avowal of a threat to use unlawful means cannot obviate the necessity of pleading facts necessary to make the threat criminal.

ID.—INDICTMENT NOT AIDED BY PRESUMPTION—PRESUMPTION OF INNOCENCE.—An indictment must show on its face that a crime has been committed, and in no case can the indictment be aided by inference or presumption. The presumptions are all in favor of innocence, and if the facts stated may or may not constitute a crime, the presumption is that no crime is charged.

ID.—MERITS OF INDICTMENT—UNFITNESS OF RESTAURANT-KEEPERS TO HAVE LICENSE NOT CONSIDERED.—The question of fact whether or not the restaurant-keepers were unfit persons to have a license, or whether that fact would be a good defense to the crime of extortion, cannot be considered in determining the merits of the indictment.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Frank H. Dunne, Judge.

The facts are stated in the opinion of the court.

Campbell, Metson & Drew, John J. Barrett, and Chas. H. Fairall, for Appellant.

The order of service and filing of the notice of appeal on the same day is immaterial, the law disregarding fraction of a day. (2 Hayne's New Trial and Appeal, 631; *Hastings v. Halleck*, 10 Cal. 32; *Buffendeau v. Edmondson*, 24 Cal. 94; *Warner v. Holman*, 24 Cal. 228; *Wright v. Ross*, 26 Cal. 263; *Boston v. Haynes*, 31 Cal. 107; *People v. Ah Yute*, 56 Cal. 119; *Hewes v. Carville*, 62 Cal. 517; *Tyrrell v. Baldwin*, 72 Cal. 192, 13 Pac. 475; *Blydenburgh v. Cotheal*, 4 N. Y. 418.) The admission of "due service" on the same day as the filing is conclusive. (*People v. Grigsby*, 62 Cal. 482; *Bonds v. Hickman*, 29 Cal. 461.) In a criminal case, under the present statute, an appeal may be taken after the *rendition* of the judgment and prior to its entry. (Pen. Code, sec. 1239.) That section is not controlled by the language of section 1240, that the notice must be filed with the clerk of the court in which the judgment is entered. (*People v. Ward*, 134 Cal. 301, 66 Pac. 372, 138 Cal. 684, 72 Pac. 343, 141 Cal. 628, 75 Pac. 306; *Ward v. Dunne*, 136 Cal. 19, 20, 68 Pac. 105; *People v. Lenon*, 77 Cal. 308, 19 Pac. 521, 79 Cal. 625, 631, 21 Pac. 967; *People v. Varnum*, 53 Cal. 630.) Section 1240 merely rests on the presumption

that the clerk will do his duty by entering the judgment of conviction "immediately," as required by section 1207, but his failure to do so cannot affect the right of appeal guaranteed by section 1239. The distinction between the rendition of the judgment by the court and its entry by the clerk is clear. (*In re Cook*, 77 Cal. 227, 11 Am. St. Rep. 267, 17 Pac. 923, 19 Pac. 431.) The proper construction of section 1239 is the same as if it read "by filing with the clerk of the court in which the judgment or order appealed from is [required by law to be] entered by the clerk." (*Bigelow* v. *Ames*, 18 Minn. 527; *Griswold* v. *Edson*, 32 Minn. 436, 21 N. W. 475; *Barzizas* v. *Hopkins*, 2 Rand. (Va.) 276, 293.) The record shows that the judgment and order were entered on the same day with the appeal, and the record cannot be contradicted by affidavits to show an improper taking of the appeal. (*People* v. *Jordan*, 66 Cal. 10, 56 Am. Rep. 73, 4 Pac. 773; *Boston* v. *Haynes*, 31 Cal. 107; *Satterlee* v. *Bliss*, 36 Cal. 521; *Thompson* v. *Patterson*, 54 Cal. 547; *Boyd* v. *Barrel*, 60 Cal. 289; *People* v. *Gough*, 2 Utah, 69; *Golden Fleece etc. Co.* v. *Cable etc. Co.*, 15 Nev. 451; *State* v. *Central Pac. R. R. Co.*, 21 Nev. 101, 25 Pac. 442; *Boggess* v. *Harris*, 90 Tex. 477, 39 S. W. 565.) The court erred in allowing peremptory challenges to sworn jurors. (*Regina* v. *Frost*, 9 Car. & P. 129; 38 Eng. Com. L. 70; 1 Chitty's Criminal Law, 545; 1 Archbold's Criminal Practice and Pleading, 163; *Gearhart* v. *Jordan*, 11 Pa. St. 325; *People* v. *Hughes*, 137 N. Y. 29, 32 N. E. 1105; *People* v. *Carpenter*, 102 N. Y. 238, 6 N. E. 584; *Kurtz* v. *State*, 145 Ind. 119, 42 N. E. 1102; *State* v. *Lyons*, 70 N. J. L. 635, 58 Atl. 398; *Thorp* v. *Deming*, 78 Mich. 124, 43 N. W. 1097; *People* v. *Dolan*, 51 Mich. 610, 17 N. W. 78; *O'Connor* v. *State*, 9 Fla. 215; *Bradham* v. *State*, 41 Fla. 541, 26 South. 730; *Mathis* v. *State*, 45 Fla. 46, 34 South. 287; *State* v. *Patrick*, 3 Jones (N. C.), 443; *Glover* v. *Woolsey*, Dudley (Ga.), 85; *State* v. *Morea*, 2 Ala. 275; *State* v. *Bunger*, 14 La. Ann. 461; *McFadden* v. *Commonwealth*, 23 Pa. St. 12, 62 Am. Dec. 312; *Hawkins* v. *United States*, 116 Fed. 569, 53 C. C. A. 663; *United States* v. *Watkins*, 3 Cranch C. C. 441, Fed. Cas. No. 16,649.) No case was shown as required by the statute. (*People* v. *Rodriquez*, 10 Cal. 59; *People* v. *Reynolds*, 16 Cal. 132; *People* v. *Scoggins*, 37 Cal. 676; *People* v. *Mortier*, 58 Cal. 262; *People* v. *Bemmerly*, 87 Cal.

120, 25 Pac. 266; *People* v. *Ward*, 105 Cal. 652, 39 Pac. 33; *People* v. *Boren*, 139 Cal. 215, 72 Pac. 899; *Peoria D. & E. Ry. Co.* v. *Puckett*, 52 Ill. App. 222; *Mayers* v. *Smith*, 25 Ill. App. 67, 121 Ill. 442, 13 N. E. 216; *Ochs* v. *People*, 25 Ill. App. 379, 124 Ill. 399, 16 N. E. 662; *People* v. *Bodine*, 1 Edm. Sel. Cas. 36; *McClure* v. *State*, 9 Tenn. (1 Yerg.) 206; *United States* v. *Watkins*, 3 Cranch C. C. 441, Fed. Cas. No. 16,649; *Montague* v. *Commonwealth*, 10 Gratt. 772; *Greer* v. *Norvill*, 3 Hill (S. C.), 263; *State* v. *Williams*, 3 Stew. 454; *Draper* v. *State*, 63 Tenn. (4 Baxt.) 246; *State* v. *Pritchard*, 16 Nev. 101; *Welch* v. *Tribune Publishing Co.*, 83 Mich. 661, 21 Am. St. Rep. 629, 47 N. W. 562, 11 L. R. A. 233.) The *ex parte* appointment of an elisor to take charge of the jury and the refusal of the court to allow any counter-affidavits was illegal; and the affidavits on information and belief for the prosecution were insufficient. (*People* v. *Smith*, 1 Cal. 9; *Ex parte Dimmig*, 74 Cal. 164, 15 Pac. 619; *Ex parte Spears*, 88 Cal. 640, 26 Pac. 608; *People* v. *Staples*, 91 Cal. 25, 27 Pac. 523; *Moore* v. *Thompson*, 138 Cal. 26, 70 Pac. 930.) The court improperly admitted hearsay testimony by the restaurant-keepers. (Code Civ. Proc., sec. 1865.) The court erred in allowing a cross-examination of the defendant about the receipt of money for Ruef, concerning which he had not testified to in chief. (Pen. Code, sec. 1323.) He cannot be forced to be a witness against himself, without his consent, on any matter outside of the strict limits of cross-examination. (Pen. Code, sec. 688; *People* v. *McGungill*, 41 Cal. 429; *People* v. *Rozelle*, 78 Cal. 93, 20 Pac. 36; *People* v. *Gallagher*, 100 Cal. 466, 35 Pac. 80; *People* v. *Arrighini*, 122 Cal. 126, 54 Pac. 591; *People* v. *Morton*, 139 Cal. 727, 73 Pac. 609; *People* v. *O'Brien*, 66 Cal. 602, 6 Pac. 695.) The court erred in restricting the cross-examination of the co-defendant Ruef, as an accomplice. (*People* v. *Williams*, 18 Cal. 191.) The evidence is insufficient to justify the verdict, there being no proof of any threat to do an unlawful injury to the property of the restaurant-keepers. The indictment is insufficient, because it shows no threat by the defendants to do an unlawful injury to property. A mere threat to prevent a liquor license, or to injure a liquor business, or to injure the mere right to acquire property, does not constitute a threat to do an unlawful injury to property within the

meaning of the law against extortion or threats.   (*"Threat"*:
Black's Law Dictionary; Pen. Code, sec. 518; Civ. Code, sec.
570.   *Property:* Pen. Code, sec. 7, subds. 10, 11, 12; *Rex* v.
*Southerton,* 6 East, 140; *Commonwealth* v. *Mosby,* 163 Mass.
291, 39 N. E. 1030; *Carew* v. *Rutherford,* 106 Mass. 1, 8
Am. Rep. 287; *In re McCabe,* 29 Mont. 28, 73 Pac. 1106.)
Mere anticipated profits are not property, or a title to
property.   (*Jones* v. *Barmm,* 217 Ill. 381, 75 N. E. 505; *In
re Wetmore,* 108 Fed. 523; *Sawyer* v. *Commonwealth,* 182
Mass. 245, 65 N. E. 52, 59 L. R. A. 726; *Cleland* v. *Anderson,*
66 Neb. 252, 98 N. W. 1075; *Hutchins* v. *Hutchins,* 7 Hill,
104; *Munn* v. *People,* 69 Ill. 80, 91; *People* v. *Coleman,* 4
Cal. 52, 60 Am. Dec. 581; *Aulanier* v. *Governor,* 1 Tex. 653;
*Wolf* v. *Wall,* 40 Ohio St. 111.)   A license to sell liquors is
not a property right, but a mere permission, subject to re-
striction under the police power, and may be lawfully with-
held.   (17 Am. & Eng. Ency. of Law, 2d ed., 230, 236, 262;
*Foster* v. *Board of Police Commissioners,* 102 Cal. 483, 41
Am. St. Rep. 194, 37 Pac. 763; *Ex parte Christenson,* 85 Cal.
208, 24 Pac. 747; *San Francisco* v. *Liverpool etc. Ins. Co.,* 76
Cal. 113, 5 Am. St. Rep. 425, 15 Pac. 380; *Hevren* v. *Reed,*
126 Cal. 219, 222, 58 Pac. 536; *Hippen* v. *Ford,* 129 Cal. 315,
61 Pac. 929; *Mugler* v. *Kansas,* 123 U. S. 623, 8 Sup. Ct. Rep.
273; *Barnett* v. *Pemiscot County Ct.,* 111 Mo. App. 693,
86 S. W. 575; *Sprayberry* v. *Atlanta,* 87 Ga. 120, 13 S. E. 197;
*State* v. *Circuit Court,* 50 N. J. L. 585, 15 Atl. 272; *La Croix*
v. *County Commissioners,* 50 Conn. 321, 47 Am. Rep. 648;
*McConkie* v. *Remlay,* 119 Iowa, 512, 93 N. W. 505, 508; *Mc-
Coy* v. *Clark,* 104 Iowa, 491, 73 N. W. 1050; *Guy* v. *Cumber-
land,* 122 N. C. 471, 29 S. E. 771; *Hargett* v. *Bell,* 134 N. C.
394, 46 S. E. 749; *People* v. *Waters,* 23 N. Y. Supp. 692, 4
Misc. Rep. 1; *Wallace* v. *Mayor of Reno,* 27 Nev. 71,
103 Am. St. Rep. 747, 73 Pac. 528; *Martin* v. *State,* 23 Neb.
371, 36 N. W. 554; *State* v. *Corran,* 73 N. H. 434, 62 Atl.
1044; *Voight* v. *Board of Excise,* 59 N. J. L. 358, 36 Atl. 686;
*Meehan* v. *Board of Excise,* 73 N. J. L. 382, 64 Atl. 689;
*Metropolitan Board of Excise* v. *Barrie,* 34 N. Y. 667; *Fell* v.
*State,* 42 Md. 71, 20 Am. Rep. 83; *Brown* v. *State,* 82 Ga. 224,
7 S. E. 915; *Calder* v. *Kurby,* 5 Gray, 597; *State* v. *Harrison,*
162 Ind. 542, 70 N. E. 877; *Littleton* v. *Burgess,* 14 Wyo. 173,
82 Pac. 864; *Lowell* v. *Archambault,* 189 Mass. 70, 75 N. E.

65; *United States* v. *Douglas,* 19 D. C. (8 Mackey) 99; *Raudenbusch's Petition,* 120 Pa. St. 328, 14 Atl. 148; *Hein* v. *Smith,* 13 W. Va. 358; *Ex parte Whittington,* 34 Ark. 394; *French* v. *Noel,* 22 Gratt. 454; *State* v. *Northfield,* 94 Minn. 81, 101 N. W. 1063; *Koehler* v. *Olsen,* 22 N. Y. Supp. 677, 68 Hun, 63; *State* v. *McCabe,* 135 Mo. 450, 58 Am. St. Rep. 589, 37 S. W. 123; *Streever* v. *Birch,* 62 Hun, 298, 17 N. Y. Supp. 195; *Wilkie* v. *Chicago,* 188 Ill. 444, 80 Am. St. Rep. 182, 58 N. E. 1004.) Inferences of fact or presumption cannot aid an indictment. It must charge it in express terms. (*People* v. *Robles,* 117 Cal. 681, 49 Pac. 1042; *People* v. *Terrill,* 127 Cal. 99, 59 Pac. 836; *People* v. *Eppinger,* 105 Cal. 36, 38 Pac. 538; *People* v. *Dunlap,* 113 Cal. 72, 45 Pac. 183; *People* v. *Jones,* 123 Cal. 299, 301, 55 Pac. 992; *People* v. *Shearer,* 143 Cal. 66, 69, 76 Pac. 813.) An "unlawful injury" to property is one prohibited by law, and must be the subject of a civil remedy. (*People* v. *Loveless,* 84 N. Y. Supp. 1114; Bishop's New Criminal Law, 178; *James* v. *Signell,* 69 N. Y. Supp. 680, 682; *United States* v. *O'Connor,* 31 Fed. 449, 457.) The indictment only shows a mere idle threat. (*Bancroft* v. *Bancroft* (Cal.), 40 Pac. 488.) Where the indictment does not show a threat specially mentioned in section 519, it shows no offense. (*People* v. *Choynski,* 95 Cal. 640, 30 Pac. 791.) A threat to do a lawful act cannot be unlawful, however bad may be the motive. (*Boyson* v. *Thorn,* 98 Cal. 578, 33 Pac. 492; *Adler* v. *Fenton,* 24 How. (U. S.) 407; *O'Callaghan* v. *Cronan,* 121 Mass. 114; *Pickens* v. *Coal River etc. Co.,* 51 W. Va. 445, 90 Am. St. Rep. 819, 41 S. E. 400; *Ferrell* v. *State,* 86 Tenn. 523, 8 S. W. 212; *Martens* v. *Reilly,* 109 Wis. 464, 84 N. W. 840; *Payne* v. *Western etc. R. R. Co.,* 13 Lea (Tenn.), 507, 49 Am. Rep. 666, 674; *Streever* v. *Birch,* 62 Hun, 298, 17 N. Y. Supp. 195.)

U. S. Webb, Attorney General, W. H. Langdon, District Attorney, Francis J. Heney, Assistant District Attorney, Hiram Johnson, and Charles W. Cubb, for Respondent.

The court has no jurisdiction of the appeal. Section 1237 of the Penal Code provides for an "appeal from a final judgment of conviction, and denying a motion for new trial." Section 1239 of the Penal Code merely limits the time within which an appeal must be taken, viz.: "An appeal must be taken from a judgment within ninety days from the rendi-

tion, and from an order, within sixty days after it is made."
This merely regulates the computation of time. Section 1240
regulates the mode of taking an appeal. An appeal is taken
by filing with the clerk of the court in which the judgment
appealed from is entered a notice stating the appeal from the
same, and serving a copy on the adverse party. The appeal
should be dismissed, because the notice was served before it
was filed. (*People* v. *Clark,* 49 Cal. 455; *People* v. *Stacey,*
34 Cal. 307; *People* v. *Bell,* 70 Cal. 33, 11 Pac. 327; *People*
v. *Lenon,* 77 Cal. 308, 19 Pac. 521; *People* v. *Colon,* 119 Cal.
668, 51 Pac. 1082, and cases cited.) The same rule has pre-
vailed under the former Practice Act, under which sections
336 and 337 held similar relations to that of sections 1239 and
1240 of the Penal Code, and the supreme court held section
337 mandatory as to the mode of taking the appeal, as .to
the order of filing and service of notice. (*Bryan* v. *Berry,*
8 Cal. 133; *Franklin* v. *Reiner,* 8 Cal. 340; *Whipley* v. *Mills,*
9 Cal. 641; *Hastings* v. *Halleck,* 10 Cal. 31; *Buffendeau* v.
*Edmondson,* 24 Cal. 95; *Warner* v. *Holman,* 24 Cal. 228;
*Boston* v. *Haynes,* 31 Cal. 107; *Foy* v. *Domec,* 33 Cal. 317.)
The same rule is applied in Idaho under a similar statute.
(*Slocum* v. *Slocum,* 1 Idaho, 589.) The admission of ser-
vice by the district attorney could not give the court juris-
diction of the cause, which could not be conferred by consent.
(*Estate of More,* 143 Cal. 493, 77 Pac. 407.) The appeal
should also be dismissed because the notice of appeal was
filed before entry of the judgment. The fact is that the time
for appeal elapses under section 1239, at the expiration of the
time therein limited; yet, under section 1240 of the Penal
Code, the appeal is premature if the notice is filed before
entry of the judgment. A premature appeal is of no avail.
(*Lorenz* v. *Jacobs,* 53 Cal. 24; *McLaughlin* v. *Dougherty,* 54
Cal. 519; *Home of Inebriates* v. *Kaplan,* 84 Cal. 488, 24 Pac.
119; *Wood* v. *Etiwanda Water Co.,* 122 Cal. 152, 54 Pac..
726; *Bell* v. *Staacke,* 137 Cal. 307, 70 Pac. 171; *Estate of
More,* 143 Cal. 493, 77 Pac. 407; *People* v. *Walker,* 132 Cal.
137, 64 Pac. 133; *People* v. *Varnum,* 53 Cal. 630; *People* v.
*McNulty,* 95 Cal. 594, 30 Pac. 963; *People* v. *Daniels,* 105 Cal.
262, 38 Pac. 720; *People* v. *Hughes,* 137 N. Y. 29, 32 N. E.
1005.) The words "a notice stating an appeal *from the
same,*" used in section 1240, must have effect. Those words
clearly mean that the notice of appeal to be filed with the

clerk in which the judgment or order is entered must state the appeal from the judgment so entered. The words "the same" clearly refer to the judgment or order entered in the clerk's office. (*People* v. *Lenon*, 77 Cal. 308, 19 Pac. 521.) Other sections of the code must be considered in connection with section 1240, indicating that it is intended to regulate an appeal from a judgment *entered*. (Pen. Code, secs. 1182, 1207, 1213, 1243, 1245, 1246, 1258-1263.) The allowance of a peremptory challenge to a sworn juror was in the discretion of the court, and is not reversible error. (*People* v. *Durrant*, 116 Cal. 179, 48 Pac. 75; *People* v. *Montgomery*, 53 Cal. 576; *People* v. *Owen*, 123 Cal. 488, 56 Pac. 251; *People* v. *Bemmerly*, 87 Cal. 120, 25 Pac. 266; *People* v. *Searcey*, 121 Cal. 2, 53 Pac. 359; *People* v. *Sowell*, 145 Cal. 300, 78 Pac. 717.) The appointment of an elisor to take charge of the jury upon a showing of disqualification of the sheriff or coroner was proper. (*People* v. *Ebanks*, 117 Cal. 652, 49 Pac. 1049; *People* v. *Fellows*, 122 Cal. 238, 54 Pac. 830.) The judgment is supported by the evidence. A threat may be shown as fully by circumstances and acts evincing it as by word of mouth. (*Armstrong* v. *Vicksburg S. P. R. Co.*, 46 La. Ann. 1448, 16 South. 468; *State* v. *Brownlee*, 84 Iowa, 473, 51 N. W. 25; *People* v. *Eldridge*, 147 Cal. 782, 82 Pac. 442; *People* v. *Donnolly*, 143 Cal. 398, 77 Pac. 179.) The statements alleged to be hearsay all referred to the connection of the restaurant-keepers with Ruef as a codefendant and conspirator with Schmitz, and they were admissible as part of the *res gestae*. (*State* v. *Grant*, 86 Iowa, 216, 53 N. W. 123; *Pacific Live Stock Co.* v. *Gentry*, 38 Or. 275, 61 Pac. 422; *People* v. *Woods*, 147 Cal. 265, 109 Am. St. Rep. 151, 81 Pac. 652; *People* v. *Pool*, 27 Cal. 575; *People* v. *Fahrenbach*, 102 Cal. 394, 36 Pac. 678; Code Civ. Proc., sec. 1870, subds. 5, 6; *Browning* v. *State*, 33 Miss. 47; *Pierce* v. *State*, 109 Ind. 535, 10 N. E. 302; *State* v. *Oeder*, 92 Iowa, 767, 61 N. W. 190; *Dyer* v. *State*, 88 Ala. 225, 7 South. 267.) The prosecution was authorized to lay the foundation for impeachment of the defendant. (*People* v. *Gallagher*, 100 Cal. 475, 35 Pac. 80; *People* v. *Rozelle*, 78 Cal. 84, 20 Pac. 36; *People* v. *Gordan*, 103 Cal. 568, 37 Pac. 534; *People* v. *Westlake*, 124 Cal. 452, 57 Pac. 465; *People* v. *Mayes*, 113 Cal. 618, 45 Pac. 860; *People* v. *Hickman*, 113 Cal. 80, 45 Pac. 175; *People* v. *Dole*, 122 Cal. 491, 68

Am. St. Rep. 60, 55 Pac. 581; *People* v. *Buckley,* 143 Cal.
388, 77 Pac. 169.)    There was nothing in the cross-examina-
tion of Ruef that was pertinent to his examination in chief,
or in any way affecting any substantial rights of the de-
fendant by its exclusion.    The indictment is sufficient under
the code.    (Pen. Code, secs. 950, 960.)    It alleges a threat to
interfere with the business of the restaurant-keepers, and
with the license known to be necessary to the business, which
would be prevented to their injury if the money extorted was
not paid.    The business of the defendant was properly en-
titled to protection.    (Words and Phrases, vol. 6, p. 5693, and
cases cited; *State* v. *Chapman,* 69 N. J. L. 464, 55 Atl. 94;
*Barr* v. *Trades' Council,* 53 N. J. Eq. 101, 30 Atl. 881;
*Consolidated Steel etc. Co.* v. *Murray,* 80 Fed. 820; *O'Brien*
v. *People,* 216 Ill. 354, 108 Am. St. Rep. 219, 75 N. E. 108;
*Ex parte Steinman,* 95 Pa. St. 220, 40 Am. Rep. 637; *O'Hara*
v. *Stack,* 90 Pa. St. 447-491; *Bailey* v. *People,* 190 Ill. 28, 83
Am. St. Rep. 116, 60 N. E. 98; Civ. Code, secs. 992, 993;
*Merchants' Ad Sign Co.* v. *Sterling,* 124 Cal. 429, 71 Am.
St. Rep. 94, 57 Pac. 468; *Trentman* v. *Wahrenberg,* 30 Ind.
App. 304, 65 N. E. 1057; *People* v. *Dederick,* 161 N. Y. 195,
55 N. E. 927; *Mapes* v. *Metcalf,* 10 N. D. 601, 88 N. W.
713, and cases cited; *Monongahela Co.* v. *United States,* 148
U. S. 312, 13 Sup. Ct. Rep. 622; *Washburn* v. *National
Wall Paper Co.,* 81 Fed. 17, 26 C. C. A. 312.)    A liquor
license issued by the authorities of a city under its police
laws, and which may be transferred subject to the ordinary
approval of the authorities, has a recognized value, and is
property.    (*Fisher* v. *Cushman,* 103 Fed. 860-864, 51 L. R.
A. 292; *In re Lyman,* 160 N. Y. 96, 54 N. E. 577.)    A
special privilege or permit may have a property value, as
matters of common knowledge.    (*Habenicht* v. *Lissak,* 78 Cal.
351, 20 Pac. 874; *Hyde* v. *Woods,* 94 U. S. 523; *Sparkhawk*
v. *Yerkes,* 142 U. S. 1, 12 Sup. Ct. Rep. 104; *Powell* v.
*Waldron,* 89 N. Y. 330, 42 Am. Rep. 301.)    A threat to injure
a business is a threat to injure property, within the law of
extortion.    (*People* v. *Barondess,* 133 N. Y. 649, 31 N. E. 240;
*People* v. *Hughes,* 137 N. Y. 29, 32 N. E. 1105; *People* v.
*Wilzig,* 4 N. Y. Crim. Rep. 403; *March* v. *Bricklayers' etc.
Union,* 79 Conn. 7, 118 Am. St. Rep. 127, 63 Atl. 291; *Long-
shore Printing Co.* v. *Howell,* 36 Or. 527, 46 Am. St.
Rep. 640, 38 Pac. 547.)    The right to acquire property by

contract or by labor is properly entitled to protection. (*Mathews* v. *People,* 202 Ill. 389, 95 Am. St. Rep. 241, 67 N. E. 28; *O'Brien* v. *People,* 216 Ill. 354, 108 Am. St. Rep. 219, 75 N. E. 111; *State* v. *Stewart,* 59 Vt. 273, 9 Atl. 559; *Regina* v. *Hewitt,* 5 Cox C. C. 162; *Underhill* v. *Murphy,* 117 Ky. 640, 111 Am. St. Rep. 262, 78 S. W. 482; *Erdman* v. *Mitchell,* 207 Pa. St. 79, 99 Am. St. Rep. 783, 787, 56 Atl. 327.) As bearing generally upon the sufficiency of the indictment, we cite the following cases: *People* v. *Cadman,* 57 Cal. 562; *People* v. *Tonielli,* 81 Cal. 275, 22 Pac. 678; *People* v. *Choynski,* 95 Cal. 640, 30 Pac. 791; *State* v. *Robinson,* 85 Me. 195, 27 Atl. 99; *State* v. *Bruce,* 24 Me. 71. An act may be an unlawful injury or illegal act when instigated for unlawful and malicious purposes or ends or by wrong means. (*Erdman* v. *Mitchell,* 207 Pa. St. 79, 99 Am. St. Rep. 783, 787, 56 Atl. 327; *Consolidated Steel & Wire Co.* v. *Murray,* 80 Fed. 811; *Plant* v. *Woods,* 176 Mass. 492, 79 Am. St. Rep. 330, 51 N. E. 1011; *Martell* v. *White,* 185 Mass. 255, 102 Am. St. Rep. 341, 69 N. E. 1085; *Walker* v. *Cronin,* 107 Mass. 562; *O'Brien* v. *People,* 216 Ill. 354, 108 Am. St. Rep. 219, 75 N. E. 108, and cases cited; *Graham* v. *St. Charles Street R. Co.,* 47 La. Ann. 214, 49 Am. St. Rep. 366, 16 South. 806, 27 L. R. A. 416; *March* v. *Bricklayers' etc. Union,* 79 Conn. 7, 118 Am. St. Rep. 127, 63 Atl. 291.)

COOPER, P. J.—Defendant was tried and convicted of the crime of extortion. After the verdict of the jury, on July 8, 1907, he made a motion for a new trial, which was denied, and thereupon the court pronounced judgment, sentencing him to the state prison for the term of five years. Thereafter, on the same day, the defendant served upon the district attorney a notice of appeal from the judgment and from the order denying the motion for a new trial, and then immediately filed the same with the clerk.

1. The district attorney moves to dismiss the appeal in this court upon two grounds: First, that the notice was served before it was filed; and second, that the appeal was premature because taken before the judgment was entered.

The provisions of the Penal Code applicable to the motion are as follows.

"1239. An appeal from a judgment must be taken within ninety days after its rendition, and from an order within sixty days after it is made."

"1240. An appeal is taken by filing with the clerk of the court in which the judgment or order appealed from is entered a notice stating the appeal from the same, and serving a copy thereof upon the attorney of the adverse party."

As to the first ground, the statute provides for filing and serving the notice, and there does not appear to be anything in the statute, and there certainly is no reason for holding that where the filing and serving are contemporaneous, the order in which they are done is material. It is necessary under the statute that the notice be *filed* and *served,* and if on the same day and about the same minute the notice is *served* and *filed,* what difference could it possibly make? The statute requires certain things to be done with the notice, and the appeal depends. upon *doing* them. They were done, and the order of doing them under the facts of this case is immaterial. It would strike any fair-minded person as being, not only highly technical, but without reason, to hold that a notice filed at 10 o'clock A. M. on the eighth day of July, 1907, and served a minute later, would be a good notice and give this court jurisdiction, and that a notice served at 10 o'clock A. M., and filed the next minute would be a worthless notice, and would not give the court jurisdiction; and yet this is what the district attorney asks us to hold. Counsel have not been able to cite any case supporting such contention, and all the cases to which our attention has been called hold that the order of the filing and service, if contemporaneous, is immaterial. It has been so held in civil cases under a section of the Practice Act which required the notice to be *filed* and *served* (*Buffendeau* v. *Edmondson,* 24 Cal. 94; *Wright* v. *Ross,* 26 Cal. 262; *Hewes* v. *Carville etc. Co.,* 62 Cal. 516) ; and in criminal cases the rule is the same. (*People* v. *Ah Yute,* 56 Cal. 119; *People* v. *Jordan,* 66 Cal. 10, [56 Am. Rep. 73, 4 Pac. 773].)

Not only this, but the notice of appeal has indorsed upon it: "Due service of the above notice of appeal is hereby admitted this 8th day of July, 1907. W. H. Langdon, District Attorney." It would have been but fair to defendant to decline to accept "due service" if the district attorney intended in any way to object to such service. Defendant could then

have *filed* and *served* the notice, but the district attorney will not be allowed to admit due service, and then, contrary to his written admission, claim that there was in fact no service. (*People* v. *Grigsby,* 62 Cal. 482.)

The second point is equally without merit. The appeal was taken after the judgment was *rendered,* and from the order after it was *made,* and this was sufficient under the language of section 1239 of the Penal Code. It was not necessary for defendant to have waited until the judgment and order were entered. The provisions of sections 1239 and 1240 are almost exactly in the language of the provision of the Practice Act in force before the adoption of the codes with respect to the time of taking an appeal. Section 336 of the Civil Practice Act was as follows:

"An appeal may be taken:

"First, From a final judgment in an action or special proceeding commenced in the court in which the judgment is rendered within one year after the *rendition* of the judgment.

"Second, From a judgment rendered on an appeal from an inferior court within ninety days after the *rendition* of the judgment.

"Third, From an order within sixty days after the order is made."

It will be noticed that under the Practice Act the appeal from the judgment must have been taken after the *rendition,* and so under the provisions of the Penal Code. It will also be noticed that under the Practice Act the appeal from an order must have been taken after the order was made, and so in the Penal Code. It was settled by a long line of decisions under the Practice Act that the time for appeal from a judgment commences to run from and may be taken upon the rendition of the judgment, and before its entry.

In *Gray* v. *Palmer,* 28 Cal. 416, it was said: "Section 336 of the Practice Act authorizes an appeal to be taken from a final judgment 'within one year after the rendition of the judgment.' . . . After a careful review of these and other sections of the Practice Act we cannot resist the conclusion that the terms 'rendition' and 'entry' are used in different senses, and to express the ideas appropriate to those words respectively; and that there is a rendition of a judgment before it is actually entered in the judgment-book. Different stages of the proceeding are recognized by the statute as in-

itial points from which other proceedings may be taken, or other rights acquired. Thus the right of appeal attaches and time for taking it commences to run from the *rendition* of the judgment by the court."

In *Peck* v. *Curtis,* 31 Cal. 207, the court said: "The judgment thus rendered on the 22d day of December, 1863, was not in fact entered in the judgment-book by the clerk till July 25th, 1864, some six months after its rendition. But an appeal from a final judgment must be taken 'within one year after the rendition' of the judgment. (Prac. Act, sec. 336.) The time begins to run from the time the judgment is rendered, not from the time it is entered. The rendition and entry of a judgment are entirely different acts—one is to be performed by the court, and must be first in order of time, and the other by the clerk." To the same effect see *Genella* v. *Relyea,* 32 Cal. 159; *Wagganheim* v. *Hook,* 35 Cal. 216; *Wetherbee* v. *Dunn,* 36 Cal. 249; *Webster* v. *Cook,* 38 Cal. 423.

And we are of opinion that the criminal cases that have arisen under the sections of the Penal Code cited support the view that the right of appeal arises immediately upon the rendition of the judgment. In *Ward* v. *Dunne,* 136 Cal. 19, [68 Pac. 105], the opinion was written by the chief justice, ordering a peremptory writ of mandate to compel the defendant as trial judge to settle a bill of exceptions. It was there said: "The petitioner was required to appeal from the judgment one year from its *rendition* (Pen. Code, sec. 1239), and to obtain a stay of proceedings he must appeal promptly without waiting for the entry of the judgment."

The district attorney contends that section 1240 of the Penal Code must mean that an appeal cannot be taken until the judgment or order is entered, because it is therein provided that the notice of appeal must be filed "with the clerk of the court in which the judgment or order appealed from is entered." The language is not the best that could have been employed by the legislature, but the meaning does not appear doubtful. The place where the notice must be filed was the main thing. The words "is entered" are used in the sense of "required to be entered," or "where the law requires it to be entered." Even if the words are not clear as to their meaning, we could not for this reason deprive a defendant of his right to appeal after the "rendition" of the judgment. The construction contended for would be contrary to the

practice in criminal cases in regard to appeals as understood by the profession for half a century. It would be contrary to the view expressed by the chief justice in *Ward* v. *Dunne,* herein quoted.

Counsel for respondent cite *People* v. *Lenon,* 77 Cal. 308, [19 Pac. 521], which they claim is directly in point. In that case no judgment appeared in the record, which of course was necessary in order to review the judgment on appeal. The opinion states: "But the notice of appeal is from 'the judgment rendered against him on the fourteenth day of May, 1888.' The minutes of the court for that day show a continuance of the case until the 16th of the same month." It does not appear that any judgment was ever rendered in that case, and hence it has no bearing on the question here.

The motion to dismiss the appeal is denied.

We will examine some of the alleged errors with a view to determining whether or not the substantial rights of the defendant were jeopardized or impaired by the rulings complained of. Defendant was entitled to a fair and impartial trial, and to the right to have a fair and impartial jury impaneled in the manner provided in the code. He was entitled to the benefit of the rules of law excluding incompetent and hearsay evidence, and to have his rights guarded and protected by the calm, dispassionate judgment of an impartial tribunal. Where a defendant has been fairly and impartially tried, his constitutional rights given to him, and only legal evidence admitted, and a jury under such trial has returned a verdict of guilty, the courts always endeavor to avoid the reversal of a case for errors which do not apparently affect his substantial rights.

2. The court, under defendant's objections, allowed challenges on behalf of the people to the jurors Harris and Bray. After three jurors had been examined, passed and sworn to try the case, the district attorney asked the court to permit the people to challenge the said juror Harris (who was one of the three) peremptorily. The court thereupon, without any *cause* being shown or even *stated,* and under defendant's objection, permitted the people to challenge the said juror peremptorily, and he was excused. Section 1068 of the Penal Code provides that a challenge must be taken "when the juror appears and before he is sworn to try the cause; but the court may for cause permit it to be taken after the

juror is sworn and before the jury is completed." It appears evident that the court could not under the section permit a challenge except "for cause," and the cause must have been based on some fact and founded upon a proper showing of facts, upon which the court could have exercised its discretion. If the court, after a juror has been sworn to try the case, can permit him to be challenged, without cause, the words "for cause" should be stricken from the statute. The code evidently intended that after a juror has been examined, passed and has taken a solemn oath to try the case, he could not then, except for a valid reason, be, at the caprice of one of the parties, discharged. He became a juror in that case, and thus a part of the machinery of the court. He became a part of the tribunal for the purpose of determining the guilt or innocence of the defendant. That tribunal was changed without the consent of the defendant, and in the interest of his adversary. (*Greer* v. *Norvill,* 3 Hill (S. C.), 262.) Defendant had the right to rely upon the fact that the juror had been sworn in exercising his right to his own peremptory challenges. The mandate of the statute appears plain and should have been followed. We know of no case, and none has been called to our attention, in which such challenge was upheld. In the early case of *People* v. *Rodriguez,* 10 Cal. 59, the court said: "The challenge may be allowed for good cause, after the juror is sworn. In this case no good cause was shown, and the offer to challenge was rightfully refused." (See *People* v. *Reynolds,* 16 Cal. 132; *People* v. *Scoggins,* 37 Cal. 679; *People* v. *Bemmerly,* 87 Cal. 120, [25 Pac. 266]; *People* v. *Ward,* 105 Cal. 338, [38 Pac. 945]; *People* v. *Durrant,* 116 Cal. 196, [48 Pac. 75].)

In the last-mentioned case the correct rule is laid down by the court, speaking through Mr. Justice Henshaw, where it is said: "Section 1068 of the Penal Code provides that a challenge (either peremptory or for cause) must be taken when the juror appears and before he is sworn to try the cause, but the court may *for cause* permit it to be taken after the juror is sworn. It was not error, therefore, for the court to permit a re-examination of the juror upon matters coming to the knowledge of the people or defendant after his acceptance, and before the completion of the jury. The course here pursued was that followed in *People* v. *Bemmerly,* 87 Cal. 117, [25 Pac. 266], and approved by this court."

The same rule was laid down in the later case of *People* v. *Owens*, 123 Cal. 488, [56 Pac. 251]. There the juror Spencer was excused for cause after he had been sworn to try the case, but upon examination in court "it was shown that the juror in arriving at his verdict would be influenced by his friendship for the relatives of the defendant."

Section 371 of the Code of Criminal Procedure of New York is in substance the same as section 1068 of our Penal Code. It provides: "A challenge must be taken when the juror appears and before he is sworn; but the court may, in its discretion, for good cause set aside a juror at any time before evidence is given in the action." The court of appeals, in *People* v. *Hughes*, 137 N. Y. 29, [32 N. E. 1105], said: "The obvious meaning of section 371 is that a challenge for good cause, which is required to be taken before the juror is sworn, may nevertheless be taken thereafter and before evidence is given, in the discretion of the court. If it does not mean that it must necessarily mean that the court may, for any good reason, even though undisclosed, set aside a sworn juror, in its discretion. I do not think that is its meaning or its purpose. If it is, there was no sound objection possible for the prisoner's counsel to take."

If we apply the reasoning of the case of *People* v. *Hughes* to the case at bar, what is the result? A challenge to a juror, either peremptory or for cause, must be taken before the juror is sworn in the first instance. If such challenge is peremptory, it is a right given by the statute, and if for cause, it must be for some cause shown to the court during the examination of the juror. If the contention of the district attorney be correct, then after a juror is sworn he can be challenged and set aside without any cause of any kind being shown. The rule we have stated is the rule in other jurisdictions. (*Greer* v. *State*, 14 Tex. App. 179; *Bell* v. *State*, 115 Ala. 35, [22 South. 526]; *Montague* v. *Commonwealth*, 10 Gratt. (Va.) 767; *Greer* v. *Norvill*, 3 Hill (S. C.), 262; *Thorp* v. *Deming*, 78 Mich. 124, [43 N. W. 1097]; *People* v. *Dolan*, 51 Mich. 610, [17 N. W. 78].)

After the juror Bray, who was one of the three, had been examined, passed and sworn to try the case, the court permitted the district attorney to further examine him, and then sustained the challenge of the district attorney to such juror for cause. It must be presumed that at the time the juror

was passed and sworn to try the cause the record up to this point showed that he was a qualified juror. The district attorney, by further examination, desired to show that the juror was related to the defendant, and this is the evidence of the juror in full:

"Mr. Heney: Q. It is reported in the paper, Mr. Bray, that you are related in some way, and that it is one of the statutory grounds of challenge in case it should be so, to the defendant, Schmitz. Is that a fact that you are? A. Not that I know of.

"Q. Through your wife? A. It might be fourth or fifth cousins or something through marriage, but I never knew it until I saw it come out in the paper. I see that the paper said that I lived—it is twenty-eight years since I lived in Watsonville, and when I left there I was married here; my wife came from the old country, and she had no people living there at all, except I think the Sheehys and Murphys were related, but I do not know anything about the Driscolls, and as far as I am concerned I knew nothing about it until since the papers came out. I never recognized Mayor Schmitz. I was never any nearer to Mayor Schmitz than I am now.

"Q. The code provision, Mr. Bray, recognizes the fourth degree of relationship, so if it was the fourth degree it would be proper to consider it. A. I really don't know how far it is. I asked to get off the jury.

"The Court: I want to say at this time when the court adjourned at noon you made some statement to me, and you finally stated to me that you proposed to ask the court and counsel to be excused from serving on this jury by reason of some relationship to the defendant.

"A. That was it, just through the paper.

"Q. You made that statement though to me, did you not? A. Yes, sir.

"Q. Do you now desire to be excused? A. Why, certainly.

"Q. Do you request counsel and the court to excuse you? A. I would like to be excused.

"Q. For the reason that you are related in some way to the defendant? A. Well, if they say so. I don't know anything about it.

"Q. Are you? A. Not that I know of—not that I know of."

The district attorney then challenged the juror "on the relationship and on the grounds provided in sections 1072 and 1073, Penal Code." Under section 1074 a challenge to a juror may be taken for implied bias if the juror is related by consanguinity or affinity within the fourth degree of the defendant. The juror said he never knew anything of any relationship until he saw it in the newspaper. That "it might be fourth or fifth cousins or something through marriage, but I never knew it until it came out in the paper."

The court, on this showing and nothing more, sustained the challenge to the juror under defendant's objection. The evidence entirely failed to show any relationship by consanguinity or affinity within the fourth degree. In fact it did not show any relationship of the juror to defendant in any degree or in any way. The judge, in ruling upon the challenge, said: "I think any relationship, no matter how remote, ought to keep a person off the jury." It was not for the judge to set up his judgment against the statute as to the qualifications of a juror. The juror did not know defendant, and did not know of any relationship. He only knew that he had seen something about it in the papers. If this juror could thus be excused without cause, there is no reason why the same thing could not have been repeated as often as the district attorney might have requested it. It is plain that the effect of the ruling was to give to the prosecution an additional peremptory challenge. The defendant exhausted his peremptory challenges, and it must be presumed that the removal of the jurors Harris and Bray without cause, after they had been sworn, was injurious to his rights. Defendant had the right to have the jury impaneled according to the law of the state under which he was being tried. The prosecution did not have the right to arbitrarily dismiss qualified jurors unless it could be done as provided by the code.

The views here expressed are ably supported in an exhaustive opinion written by Mr. Justice Henshaw in *People* v. *Helm*, 152 Cal. 532, [93 Pac. 99]. The case was reversed upon the rulings of the trial judge refusing to sustain defendant's challenges to certain jurors on the ground of implied bias. The court said that if the defendant had been compelled to exhaust his peremptory challenges to relieve himself of jurors who should have been excused by the court for

cause, "the rulings of the court upon such jurors becomes a most important matter of review."

The code provisions in regard to the impanelment of jurors and their qualifications have in view the right of the defendant to a fair and impartial jury, and one not picked and selected by the prosecution. The defendant is given twice the number of peremptory challenges that are given to the people. His liberty, in many cases his life, is at stake. When public passions have been aroused, and oftentimes a desire for conviction taken possession of the public mind, there is more reason that the rights of a defendant should be carefully guarded at every step. It was well said by Judge Cooley in *People* v. *Holt*, 13 Mich. 224, that if, after an examination of a juror there is "a reasonable doubt of the impartiality of the juror, the defendant should be given the benefit of the doubt.

3. After the jury had been impaneled and sworn, the district attorney asked the court to appoint an elisor under section 4192 of the Political Code to take charge of the jury, under the order of the court, that the jury be kept together. In support of the motion he offered several affidavits. After some discussion and objections the following took place:

"The Court: It is my intention, it has always been my intention to order this jury to be taken in charge by a competent and proper person when the time comes. I will read the affidavits. I will read them myself."

"Counsel for Defendant: We object to their being read by the court."

"The Court: Just pass the affidavits up to me."

After the court had read the affidavits, counsel for defendant said: "That the matter may be regular I want the reporter to register our objection."

"The District Attorney: That is a matter over which neither of us have any control. It is nothing with which we are concerned."

"The Court (to Defendant's Counsel): It is no concern of yours, Mr. Barrett; you have nothing to do with it."

"Mr. Barrett: I am going to take an exception to that."

"The Court: You may do so. Object to the whole thing, but I want to make it plain to you that it is none of your business."

"Mr. Barrett: I understand it is the attitude of the court that it is none of my business?"

"The Court: Exactly. The court, in the performance of its duty, proposes to have this jury locked up and placed in charge of a competent and proper person. You can object. I believe you have objected, and I would like to have you take your seat."

After some other discussion the attorneys for the defendant objected to the court reading the affidavit.

"The Court: Mr. Barrett, I am going to ask you to take your seat."

"Mr. Barrett: I except to the order requiring me to take my seat. I except to your honor reading the affidavit until we have had an opportunity to file counter affidavits."

"The Court: You may take your seat now."

"Mr. Barrett: Very well. Save an exception."

Counsel for the defendant then stated to the court that the affidavits had not been served upon defendant nor his counsel, and that they contained much irrelevant and immaterial matter, and objected to "your honor at this time considering these affidavits before they have been served upon us, and until we have had an opportunity to file reply affidavits."

The court thereupon overruled the objection and admitted the affidavits in evidence, after reading them. The court then made an order declaring the sheriff and the coroner each disqualified, and appointing one Biggy to act as elisor, to which the defendant duly excepted. The court refused to allow defendant to file affidavits relating to the enmity of Biggy to defendant, touching the qualification of Biggy to act as elisor in said matter, to which ruling refusing leave to file affidavits showing such disqualification the defendant excepted.

The right to appoint an elisor is claimed under section 4192 of the Political Code, which provides that "Process and orders in an action or proceeding may be executed by a person residing in the county designated by the court or the judge thereof, and denominated an elisor," when it appears by affidavit to the satisfaction of the court or judge that the sheriff and coroner "are disqualified, or by reason of any bias, prejudice or other cause, would not act promptly or impartially." Let it be conceded for the purpose of this discussion that taking charge of a jury in a criminal case during the trial is the execution of an order in the proceeding, and

that the affidavits filed by the district attorney showed a *prima facie* case of disqualification of the sheriff and coroner. Was it no concern or business of the defendant as to whether or not the officers of the law should be set aside, and a third party placed in charge of the jury? Must the *ex parte* affidavits offered by the prosecution, that had not even been served upon the defendant or his counsel, be held conclusive upon defendant, and was this a question upon which he had no right to be heard?

Without analyzing the rulings of the court in detail, it is sufficient to say that it appears that the court refused to allow the defendant to file counter-affidavits as to the fact of the disqualification of the sheriff and coroner, and acted upon the *ex parte* affidavits of the prosecution, which had not been even served upon the defendant. The court further refused to hear the defendant as to the enmity and disqualification of the elisor Biggy. It was held by the court that the prosecution might have the sheriff and coroner declared disqualified from taking charge of the jury because they would not act impartially. It was in the next breath held that the defendant had no right to show that the elisor was disqualified by reason of bias and prejudice against defendant.

These matters were of the utmost importance to defendant. If it was necessary, in order to subserve the ends of justice, that the political friends of the defendant should not have charge of the jury, it was equally necessary, in order to protect the rights of the defendant, that the elisor should not be a personal enemy of the defendant or in the employ of the prosecution. Fair dealing and the rights of the defendant required that he should be heard upon both propositions. If, after giving the defendant the right to be heard by affidavits or otherwise, the court, upon a full investigation of the facts, concluded that the sheriff and the coroner were disqualified, that would be a matter resting in the sound discretion of the court, and if the court concluded to appoint an elisor it was equally important that the elisor should not have any bias or prejudice either for or against the defendant. Defendant had the right to be heard as to the qualifications of the sheriff and coroner, and also as to whether or not Biggy was qualified. If the sheriff, by reason of his friendship for defendant, might in some way have influenced the jury, if

they had been placed in his charge, it is equally clear that the enmity of Biggy to the defendant, or his friendship for the prosecution, might in some way have influenced the jury. It was of the utmost importance to the defendant.

4. The court erred in admitting hearsay evidence of the witnesses Loupe, Blance, Malfanti, Debret, and Rosenthal. The evidence and the many exceptions and rulings are discussed under one heading, and the time at our disposal will not permit us to discuss them in detail. The evidence related to many statements and conversations made by the parties named, in the absence of the defendant, and in the absence of Ruef, who is charged with the same offense, as to the necessity of employing Ruef, the amount of fee to be paid him, and the proportion to be paid by each. The following is a sample of such hearsay evidence. The witness Debret testified that at one of these meetings "we were talking about what could be done, and we could see that we were going to be held up. . . . Priet went to see Ruef only after the special meeting of the board of police commissioners was called, and when he came back he did not get any satisfaction at all. . . . We talked the matter over, and we saw that we could not get away without paying. Then he said we had better go and see Ruef. So he went to see Mr. Ruef. . . . When Priet came back he said Ruef told him he would take the case for $10,000. He was to be paid $5,000 first year, and $5,000 the following year. . . . Yes, I knew in what way my partner got the money that he gave to Ruef. Mr. Ruef would not take my check, would not take any gold, he would not give any receipt for it."

The witness Rosenthal testified that at one of these meetings "I told them, from my observation and how things were going in the city, and had been going on for some years, that there was only one man who could help them—it was a question of life and death with them, and I said 'there is only one man who could help you, and that was Mr. Ruef.'"

The witness Adler testified that at one of these meetings "Priet came back to my place and said he had made an agreement for $5,000 a year with Mr. Ruef for two years. We had a talk as to how it was to be paid. My share was $1,175 a year, which I paid to Malfanti. I agreed to employ Ruef, and paid that money because I could not run my business without a license—to get my license—because he had influence

before the commissioners, he was the only man who could help us."

The testimony was all objected to because hearsay, and as to matters and things that took place in the absence of the defendant. The acts and declarations were the acts and declarations of third parties. If Ruef was a co-conspirator there is no act or declaration of Ruef given in evidence in furtherance of such conspiracy. It is the policy of the law to exclude hearsay evidence with certain exceptions, well known to the profession. A defendant has the right to be confronted with the witnesses against him as to any act, matter or thing done or said by him, tending to connect him with the commission of an offense. His admissions, if he has made any, may be received against him. His conduct and acts in many cases are admissible. If he has entered into a conspiracy the declaration of a co-conspirator during the continuance of the conspiracy and in furtherance of the common design is admissible in evidence. But the sages of the law and the learned judges have established the rule that the independent acts and declarations of one man shall not be evidence against another. It is sufficient for everyone to answer for his own sins, and not for the sins of his neighbor. The rule is thus laid down in our Code of Civil Procedure, section 1845: "A witness can testify to those facts only which he knows of his own knowledge; that is, which are derived from his own perceptions, except in those few express cases in which his opinions or inferences, or the declarations of others, are admissible." Section 1870 declares:

"Evidence may given upon a trial of the following facts:

"1. The precise fact in dispute.

"2. The acts, declarations, or admissions of a party, as evidence against such party.

"3. An act or declaration of another in the presence and within the observation of a party, and his conduct in relation thereto. . . .

"6. After proof of a conspiracy the act or declaration of a conspirator against his co-conspirator, and relating to the conspiracy."

The evidence admitted does not come within any of the exceptions to the rule. The conversations, statements, opinions, and agreements of these proprietors of French restaurants, made without the authority of the defendant and in his ab-

sence, were all hearsay, and should not have been admitted. It is the rule well established that the admission of hearsay evidence that is injurious to a defendant is ground for reversal. (*People* v. *Griffin,* 52 Cal. 616; *People* v. *Gonzales,* 71 Cal. 569, [12 Pac. 783] ; *People* v. *Hall,* 94 Cal. 595, [30 Pac. 7] ; *People* v. *Hill,* 123 Cal. 571, [56 Pac. 443] ; *People* v. *Landis,* 139 Cal. 426, [73 Pac. 153].)

5. The theory of the prosecution was that the defendant, as mayor of the city of San Francisco, exercising his powers over the board of police commissioners, and particularly with the police commissioner Reagan, had conspired with his co-defendant Ruef to refuse to issue licenses to the French restaurant keepers so that they would be compelled to employ Ruef, and thus pay for their licenses; that Reagan was an honest man, and was prevailed upon and advised by defendant, who had influence over him; that while Ruef, the co-conspirator, received the $5,000 ostensibly as an attorney's fee, he being an attorney, he divided with and paid a part of it to defendant. The prosecution did not place Ruef upon the stand as a witness in chief, but closed its case without any attempt to prove by direct testimony that Ruef gave to defendant, or that defendant ever received, any of the money so claimed to have been paid to Ruef, or that he was ever paid any money by anyone on account of such licenses. Reagan, a witness for the prosecution, testified to certain conversations had with defendant. One Malfanti also testified to a conversation with defendant. Defendant, as a witness in his own behalf, was examined in chief upon four separate matters, as to conversations and statements. Reagan testified that he had a conversation with defendant early in the summer of 1904 in the mayor's office in the New City Hall, in which conversation, in the language of Reagan, "the mayor told me they were bad places, to hold them up, and if possible to close them up, to visit them and see for myself what they were."

The defendant was examined in chief as to this conversation, and in effect denied that he had so stated to Reagan, his language being, "In that conversation I did not state to Mr. Reagan that the French restaurants were all bad and ought to be closed up. I did not state to him that I wanted him to close them up."

Reagan further testified that at the request of the defendant he visited the New Poodle Dog restaurant, was shown all over the house, saw nothing wrong, and so reported to defendant; that defendant said to witness "that I didn't call at the right time."

The defendant testified in chief to the fact that Reagan did report to him as Reagan stated, but said: "I did not say to him that he did not go at the right time."

Reagan further testified that after the police commissioners had revoked the license of the Tortoni restaurant he reported the facts to defendant, stating the substance of the testimony which had been produced before the board as to immoral women being brought there, and that the defendant then said, "They were all bad, that they should be closed up. I went to the mayor and said it was reported to me that $28,-000 was collected as a fund by the restaurants to be used to secure the reissuance of their licenses."

Defendant testified in substance to the same facts, as to Reagan reporting to him, but said, "At that time I did not say to Reagan that Tortoni's was bad, but that all the rest of them were as bad as Tortoni's." Nor did Reagan "state to me that there had been a fund of $28,000 as a sack raised by the French restaurants for the purpose of obtaining their licenses."

Malfanti, the proprietor of Delmonico's, as a witness for the prosecution, testified to a conversation with the defendant in the early part of 1905 in the presence of Priet and Blanco, in which conversation he asked defendant why the licenses of the French restaurants were being held up, and that defendant said, "I'll see what I can do. I will have a special meeting of the police commission. I will be there myself and see what I can do. We don't want to do anything wrong about those places."

The defendant, as a witness in his own behalf, admitted this conversation in substance. His evidence is: "Malfanti came into the room, and said to me, 'Mayor, what is the matter? Our licenses are being held up.' I said, 'I don't know; I don't think there is anything the matter, but I will see them this afternoon and see what can be done.' "

The entire testimony of defendant in chief was as to the conversations as above stated and his version of them. The name of Ruef was not mentioned. It was not even men-

tioned that any money was paid to Ruef or to anyone else. The defendant had not denied the conversation with Malfanti. He did deny, and was examined about, the following statements made by Reagan: 1. That he told Reagan that the French restaurants were all bad and ought to be closed. 2. That he told Reagan, after Reagan's visit to the Poodle Dog, that he did not call at the right time. 3. That Reagan told defendant that it was reported that $28,000 had been raised as a fund by the French restaurants so as to get their licenses.

The three matters stated, although apparently not of much importance, were all the matters concerning which the defendant was examined in chief.

On cross-examination the prosecution asked, and defendant was compelled to answer, the following questions: ''Did Ruef pay you any part of the $5,000 that has been testified he received from the French restaurants?'' The question was repeated in many ways and forms, and defendant was always compelled to answer it. His attorneys objected to all of the questions on the ground that they were incompetent and not proper cross-examination, and the objections were overruled. The following is a part of the record:

''Mr. Heney: Q. Did not Mr. Ruef pay you one-half of the $3,000 which was paid to him by Malfanti in January, 1906, and didn't he tell you at that time—well, first, didn't he pay one-half of that money to you?

''Mr. Campbell: I object to that on the same ground, the ground it is incompetent, irrelevant and immaterial, and not cross-examination.

''The Court: That is the second?

''Mr. Heney: That is the second.

''The Court: I will overrule the objection.

''Mr. Campbell: I will give you the same instruction, Mr. Defendant, in relation to that.

''Mr. Barrett: Does your honor hold there are no limits to the right of cross-examination?

''The Court: Take your exception.

''Mr. Barrett: I take an exception. I would like your honor to inform us so we may guide ourselves.

''The Court: Just take your seat. (To the bailiff:) Put him in his seat, and if he does not take it put him out of the room.

"Mr. Barrett: We assign as misconduct the remarks of your honor in respect to this witness.

"The Court: Answer the question."

In our opinion the cross-examination was entirely improper, and was not confined to the matters about which defendant had been examined in chief. The Penal Code provides (section 688) that no person can be compelled in a criminal action to be a witness against himself, and further (section 1323): "But if a defendant offers himself as a witness he may be cross-examined as to all matters *about which he was examined in chief."* The defendant, by placing himself upon the stand, became subject to the rules that govern any other witness except as expressly provided in the code. He was subject to the rules for impeachment that apply to all witnesses. He was subject to cross-examination fully as to all matters about which he had been examined in chief. The cross-examination was as to whether Ruef paid defendant any of the $5,000, which it was claimed Ruef received. Let us ask the plain common sense question as addressed to a person of ordinary understanding—Was defendant examined in chief about the $5,000 or the payment of any part of it to himself? The answer is "No." If the defendant was examined in chief about the payment of money to himself by Ruef how does it appear? The conversation with Reagan about the French restaurants all being bad and that they should be closed, was not about the payment of money to defendant by Ruef. The conversation as to Reagan's visit to the Poodle Dog was not about the payment of money to defendant by Ruef. The conversation with Reagan to the effect that Reagan told defendant that he (Reagan) had been told that $28,000 had been raised as a fund by the French restaurants, was not about the payment of money by Ruef to defendant. Whether or not Reagan had made such statement was the subject about which defendant had testified. Reagan had testified that he informed defendant of a certain report. Defendant denied that such information was given him by Reagan.

The decisions are uniform that under the section quoted the cross-examination of a defendant cannot be extended beyond the subject matters concerning which he was examined in chief. (*People* v. *McGungill,* 41 Cal. 429; *People* v. *Rozelle,* 78 Cal. 93, [20 Pac. 36]; *People* v. *Gallagher,* 100 Cal.

466, [35 Pac. 80]; *People* v. *Arraghini,* 122 Cal. 126, [54 Pac. 591]; *People* v. *Morton,* 139 Cal. 727, [73 Pac. 609].)

We have carefully examined the case of *People* v. *Gallagher,* 100 Cal. 466, [35 Pac. 80], relied upon by the prosecution, but find nothing in it in any way inconsistent with what has been said. The question in cross-examination of the defendant in that case related to sums of money being changed into currency in San Francisco in company with and in connection with one Bieggs, who was *particeps criminis,* and as to defendant going to Sixteenth street with $6,000 at Biegg's dictation, but defendant in his direct examination had testified about meeting Bieggs by appointment, that he did not advise Bieggs to draw the money from the bank, or to go off with it, nor suggest nor consent to his doing so. It is plain that the cross-examination related to the very matters— "Bieggs," "the money," and "going away with it," which had been testified to by the witness in chief. We fully agree with the statement in that case that if the questions "would have the tendency to elucidate from him the whole truth about any matters upon which he had been examined in chief" they would be proper; but the reasoning does not apply to the facts in this case, because this defendant was not examined about the matter in chief.

The cross-examination being erroneous, the error was not cured by the witness answering the question in the negative, for the reason that the prosecution subsequently used this examination of the defendant as a basis for introducing certain evidence of Ruef, which properly was a part of the case of the People in chief. (*People* v. *Morton,* 139 Cal. 727, [73 Pac. 609].) Negative answers were perhaps what the prosecution expected, so that under the guise of rebuttal they could call Ruef to the stand to contradict the defendant, and that is what was done. It is evident that by the rules of law, and that regard to fairness which characterize every criminal trial, if the prosecution had evidence to prove that defendant took or accepted part of the money extorted by the conspiracy and paid to his accomplice Ruef, such evidence should have been produced as a part of the case for the prosecution. The defendant had the right to hear the evidence against him before being required to meet it. The evidence, and all the evidence, tending to show his guilt should have been produced. If Ruef paid or gave defendant money, part of the

proceeds of the crime, the prosecution should have produced the evidence as a part of its case. The defendant would then have had the right to meet the evidence as part of his defense. In this case Ruef was not placed upon the witness stand, nor was any evidence given as to any money being paid to defendant; but the evidence was held back until defendant was asked the questions in cross-examination. Then, in the guise of rebuttal, the evidence of Ruef was brought forth, under the claim that it was to contradict the defendant, but really for the purpose of proving facts which were part of the case for the prosecution in the first instance. Such practice would be a great injustice to a defendant. It would be contrary to the way criminal trials are usually conducted in our courts. It would be contrary to every man's sense of right and justice. It is of much more importance that every defendant should have a fair and impartial trial under the rules of evidence laid down by the ablest judges and established by centuries of experience, than that a defendant in some particular case should be convicted. It is important that a defendant, if guilty of the crime with which he is charged, should be convicted; but it is of greater importance that the constitutional right of each and every one to a fair trial, under the rules of evidence and the forms of law adopted in the light of experience, shall be preserved inviolate. It goes to the very foundation of our republican institutions.

6. The prosecution, under the claim that it was rebuttal, called for the first time the witness Ruef, who was allowed, under defendant's objection and exception, to testify that about January or February, 1906, he gave to defendant at one time $2,500, and at another $1,500 in currency, at the same time stating to defendant that it was part of the money he, the witness, had received from the French restaurants as a fee under his agreement with them, and that if defendant would receive it he would be glad to pay it to him, and that defendant did receive it. The evidence could not possibly have been rebuttal except for the purpose of contradicting the statement elicited from defendant on cross-examination; and as we have already held that such cross-examination was erroneous, it is not necessary to discuss the question in this regard further. The defendant's counsel asked many questions of the witness Ruef in cross-examination, to which

objections were sustained, only a few of which we will notice, as they are enough to illustrate the view we entertain of the ruling.

The witness admitted that he had stated to the prosecution that if he should testify to the facts in all their details, as they are, the larger part of them would in his judgment be favorable to the defendant. Counsel for the defendant then asked the question: "Well, what were those facts, state them now in detail in relation to this case?" The court sustained the objection of the prosecution to this question. The witness testified that he had had many conversations with Mr. Burns, a detective in the employ of the prosecution, and with Mr. Heney, a deputy district attorney, as to his testimony, and as to leniency being shown him in case he should testify fully as to the facts. The attorney for the defendant then asked him: "Did you at any conversation with these gentlemen tell them that you would not stand for anything except complete immunity?" The court sustained the objection of the district attorney to this question upon the ground that it was irrelevant, incompetent and immaterial and no foundation had been laid. The witness had in the first place pleaded not guilty to the indictment in this case, but afterward withdrew his plea, and entered a plea of "guilty." Defendant's counsel, after eliciting such facts from the witness, asked him the following questions (referring to his plea of "not guilty"):

"Q. Was that true?"

"Q. What do you mean then, Mr. Ruef, by that statement that you were not guilty of this charge?"

"Q. Mr. Ruef, why, if you were not guilty in this case, as you stated, did you change your plea after you had your conversation with Mr. Burns, in which he told you he would do all he could for you to secure leniency in these indictments?"

To each of the above questions the court sustained objections made by the district attorney upon the ground that they were not proper cross-examination.

The attention of this witness was called to a verified answer filed by him in November, 1906, in a civil suit which had been brought against him by the district attorney, in which he swore that he had not committed any felony or any crime in any way in connection with the matters alleged in the complaint which had been filed against him. Defendant's counsel

then, with the answer before them, asked the witness several questions as to portions of the answer, and as to why, after swearing that he had not committed any crime, he afterward entered a plea of guilty as to the same matter. The court again sustained the objection of the district attorney to each and every such question as not proper cross-examination.

The witness was asked as to the time of paying or giving to the defendant the money in currency as testified to by him, and defendant's counsel then asked the following question: "Q. Did you have, prior to that time, any conversation with defendant in relation to any division, or giving him any part of any fee which you received from the French restaurant-keepers?" The court, under the objection of the prosecution, refused to permit the witness to answer.

Other questions were:

"Q. Mr. Ruef, did you go to the French restaurant-keepers. or did they come to you?"

"Q. Did you tell the defendant in any conversation that you had ever threatened any restaurant-keeper, that if they did not pay you any money their licenses would be held up?"

"Q. Now I will ask you this, Mr. Ruef, if you are not now giving your testimony under the expectation of immunity—complete immunity?"

The court refused to permit any of these questions to be answered, and held that they were not proper cross-examination.

These rulings were erroneous and highly prejudicial to defendant. The witness Ruef was jointly accused of the alleged crime for which the defendant was being tried. Not only this, but he had confessed it and pleaded guilty to it. He was the party who made the contract with the proprietors of the French restaurants, and who received the money from them. After having done all these things, and after having confessed himself guilty of a felony, he turned and took the witness stand against one who had been his friend—at least his political friend. He not only confessed himself a criminal, but went upon the stand to assist in convicting his co-defendant of the alleged crime of which he had pleaded guilty. His conduct had been such that under the plain provisions of the Penal Code his evidence was branded so that the defendant could not have been convicted upon it without corroborative testimony. Then was it not fair and just to de-

fendant, in order to investigate and arrive at the truth, that the reasons, motives and surroundings of the witness should be laid bare.  He had changed his plea of "not guilty" to one of "guilty," and his attitude of friendship to defendant to that of a witness aiding and assisting the prosecution.  If he had been promised complete immunity, did not the defendant have the right to lay the fact before the jury so that they might determine the weight to give his evidence?  If he had, in another case, before any promise had been made to him, sworn to facts inconsistent with his present testimony, was that no concern of the defendant?  The jury had the right to believe the witness Ruef, but the defendant had the right to investigate every motive, every statement, every act, and everything that might in any reasonable way have influenced him in his testimony, and to have the jury know this before passing its judgment.  In such cases it is elementary that the broadest scope should be allowed in the cross-examination of the witness.  It is provided in the Code of Civil Procedure, section 1844, that the presumption that a witness speaks the truth may be "repelled by the manner in which he testifies, by the character of his testimony, or by evidence affecting his character for truth, honesty or integrity, or his motives, or by contradictory evidence, and the jury are the exclusive judges of his credibility.  (See *People* v. *Mitchell*, 5 Cal. App. 45, [89 Pac. 853].)  It is further laid down in the code (Civ. Code, sec. 2061) "that the testimony of an accomplice ought to be viewed with distrust."

The court allowed the prosecution a broad range in the cross-examination of the defendant, who is protected by the statute, and who had not confessed to having committed a crime; while, on the other hand, it narrowed and confined the cross-examination of the co-conspirator, who was not protected by the statute, and who had branded himself as a felon.  Such is not the policy of the law.

7. Defendant's demurrer to the indictment was overruled, and it is now insisted that the indictment does not state facts sufficient to show that any public offense has been committed.

It is necessary to pass upon the question, for the reason that if the indictment fails to charge defendant with a public offense that is the end of the case.

The indictment charges in substance that defendants are guilty "of a felony, to wit, extortion," committed on the

fifteenth day of January, 1905, in the city and county of San Francisco, as follows: That defendants did unlawfully and feloniously extort from the parties named in the indictments, with their consent, $1,175, by the wrongful use of fear, induced by means of threats to do an unlawful injury to the property of the parties named, the specific threat being alleged as follows: "That the said Joseph Malfanti, Charles Kelb and William Lafrenz were then and there engaged in the business of maintaining and conducting a restaurant in the city and county of San Francisco and of selling at retail spirituous, malt and fermented liquors and wines therein, and for the purpose of continuing the selling of said liquors and wines, the said Joseph Malfanti, Charles Kelb and William Lafrenz were required to have and obtain a license from the city and county of San Francisco, and the said license was necessary to the said Joseph Malfanti, Charles Kelb and William Lafrenz for the profitable maintenance and conduct of the said business and the selling of said liquors and wines, all of which facts the said Eugene E. Schmitz and Abraham Ruef then and there well knew; that the said defendants, Eugene E. Schmitz and Abraham Ruef, then and there unlawfully, feloniously, corruptly and knowingly threatened the said Joseph Malfanti, Charles Kelb and William Lafrenz that, unless the said Joseph Malfanti, Charles Kelb and William Lafrenz should then and there pay to them the said sum of money hereinbefore referred to, and promise and agree to pay one year thereafter a further sum of one thousand dollars, the said Joseph Malfanti, Charles Kelb and William Lafrenz could not and would not obtain said license for the sale of said liquors and wines from the said city and county of San Francisco, and the said defendants Eugene E. Schmitz and Abraham Ruef would prevent the said Joseph Malfanti, Charles Kelb and William Lafrenz from carrying on or conducting the said business of selling said wines and liquors at retail as aforesaid."

The indictment is claimed to be invalid for two reasons: 1. That it does not allege any threat to injure *property;* and 2. That it does not allege that the threat was to do an unlawful injury.

Extortion is defined in the Penal Code (section 518) as "the obtaining of property from another, with his consent, induced

by a wrongful use of force, or fear, or under color of official right."

Sec. 519. "Fear such as will constitute extortion may be induced by a threat either: (1) to do an unlawful injury to the person or property of the individual threatened, or to any relation of his, or member of his family. . . ."

It is not claimed that the money was obtained by force, or under color of official right, as there is no allegation in the indictment that defendant ever held office. It is plain that the extortion relied upon is the threat to injure the property of the parties named in the indictment. The indictment states that the parties whose money was taken were engaged in the business of conducting a restaurant, and 'of selling spirituous liquors and wines at retail, "and for the purpose of selling said liquors and wines the said (parties) were required to have and obtain a license from the city and county of San Francisco, and the said license was necessary to said (parties) for the profitable maintenance and conduct of said business and the selling of the said wines and liquors." The threat, as alleged, was that if the parties named did not pay the sums demanded, they "could not and would not obtain said license for the sale of said liquors and wines," and that defendants would prevent the said parties "from receiving said license or obtaining the same, and prevent (said parties) from carrying on or conducting the said business of selling said wines and liquors at retail as aforesaid." The threat alleged is a threat to prevent the parties from obtaining a liquor license, and thus to prevent them from carrying on the business of selling wines and liquors at retail. There is no allegation as to any threat to injure any business in direct terms, but only the threat to prevent the parties from obtaining a license to sell liquors.

A license to sell liquors is not property in the ordinary sense of the word, but a mere permission, and the license is but the evidence that the permission has been given by the proper authorities. (*Hevren* v. *Reed*, 126 Cal. 219, [58 Pac. 536]; *City of Sonora* v. *Curtin*, 137 Cal. 583, [70 Pac. 634]; *Sprayberry* v. *Atlanta*, 87 Ga. 120, [13 S. E. 197]; *McConkie* v. *Remley*, 119 Iowa, 512, [93 N. W. 505].) There is grave doubt as to whether a threat to prevent a party from obtaining a permission or license, by one who has no authority in the premises, is a threat to injure property within the mean-

ing of the sections quoted. (Pen. Code, sec. 7, subds. 10, 12; *In re McCabe,* 29 Mont. 28, [73 Pac. 1106]; *Wolf* v. *Wall,* 40 Ohio St. 111; *Carew* v. *Rutherford,* 106 Mass. 1, [8 Am. Rep. 287].) It is, however, unnecessary to decide the question in this case for the reason that we are clearly of the opinion that the indictment is insufficient, because it does not allege nor show that the specific injury threatened was an unlawful injury. The indictment does use the words "unlawful injury" in the first part of it; but when the facts are specifically set forth as to what the defendants threatened to do we find that the threat was that defendants "would prevent the said Joseph Malfanti, Charles Kelb and William Lafrenz from receiving said license or obtaining the same." There is no allegation that any unlawful act was threatened, and the attorneys for the prosecution frankly admit that they rely upon the fact that the defendants obtained the money by threatening to do an injury, which they claim was unlawful solely for the reason that the threats were made with intent to extort money. In other words, it is claimed that even though the French restaurant proprietors were violating the law, and conducting immoral places used as resorts by lewd women, and thus not legally entitled to a license to sell liquor, a threat to prevent the issuance of licenses to such places by laying the facts before the board of police commissioners in a legal manner, constitutes a crime if such threat was made with the intent to extort money. Such, in our opinion, is not the law. The statute uses the words that the threat must be to do "an unlawful injury"; and in order to charge a crime the indictment must aver in some way that the threat was to do an unlawful injury. It is apparent from the language of the statute which we have hereinbefore quoted, that it is not every kind of fear that will support a charge of extortion because of property obtained thereby. The fear must be induced by one of the threats enumerated in the statute. The legislature has seen fit to provide that the threatened injury to property upon which a charge of extortion may be predicated must be an unlawful injury to property. That is, the injury threatened must be, in itself, unlawful, irrespective of the purpose with which the threat is made. As the word "unlawful" is used in the statute it qualifies the "injury" and not the "threat." Unlawful means contrary to law. It is true that from a high standard of ethics it could

not be claimed that one could extort money by a threat to do a lawful act, if the intent was to get money by the use of the threat, but every wrong is not made a crime. There are many wrongs done every day that are not enumerated in the category of crimes contained in the Penal Code that are of much more serious consequence in their nature than others which are defined therein; but we must look to the statute to find whether or not an act is a public offense for which a prosecution will lie. To procure property from others by a mere threat to do a lawful act is not a crime. The object of the statute—or at least one of its objects—is to protect the party from whom the property is extorted; and if such party pays the money in order to secure protection in violating the law himself he cannot be heard to complain. He in such case would be a party to the violation of the law. In this case, if the parties as a fact paid the money in order to prevent the evidence as to the character of places they kept from being exposed to the board of police commissioners, they are not in a position to complain. A man owning a lot would have the right to build a stable upon it. If he should threaten his neighbor that he would build such stable unless paid $1,000, and under this threat the $1,000 was paid, the party receiving the money would not be guilty of a crime. He did not threaten to do an unlawful injury, because he had the right to build the stable upon his own lot. Anyone has the right to go before the board of police commissioners, if that body will hear him, and object to the granting of a license to sell liquors to a person who is keeping a place in violation of the law. He has the right to threaten to do so. He would not be morally justified in obtaining money to induce him not to carry out his threat, but if he did receive money under such circumstances he would not come within the provisions of the statute. It is necessary in other crimes to allege that the act was unlawful. Murder is the *unlawful* killing of a human being with malice aforethought. Mayhem is *unlawfully* depriving a human being of a member of his body. An assault is an *unlawful* attempt to commit an injury upon the person of another, and in other crimes the act must either be alleged to be unlawful or felonious, or the facts must show it to be so. In *People* v. *Loveless,* 84 N. Y. Supp. 1114, it is said that unlawful injury means "an injury resulting from an act prohibited by the laws of the state." To the same effect see

*State* v. *Hayworth,* 35 Tenn. 64; *Johnson* v. *State,* 66 Ohio St. 59, [90 Am. St. Rep. 564, 63 N. E. 607] ; *Tatum* v. *State,* 66 Ala. 465; 2 Bishop's New Criminal Law, 178; *Davis* v. *State,* 37 Tex. Crim. App. 47, [66 Am. St. Rep. 791, 38 S. W. 792].,

Many other questions are discussed as to refusing certain instructions asked by defendant, and as to the insufficiency of the evidence to justify the verdict, but in view of the holding as to the indictment it would serve no useful purpose to discuss them.

The judgment and order are reversed, and the trial court is directed to sustain the demurrer to the indictment and discharge the defendant as to such indictment.

Hall, J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 9, 1908, and the following opinion was then rendered:

THE COURT.—This is an application by respondent for a hearing and determination of this appeal by this court, after decision and judgment by the district court of appeal for the first district.

There is absolutely no merit in the contention of respondent that the appeal was prematurely taken, and hence should be dismissed. This matter was sufficiently and satisfactorily covered by what is said in regard thereto in the opinion of the district court of appeal.

The court is unanimous in the opinion that the district court of appeal was correct in its conclusion that the indictment was insufficient, in that it did not show that the specific injury to the property of the restaurant-keepers threatened by the defendant was an "unlawful injury."

It is very clear that to constitute the crime of extortion committed by means of any threat to injure property of the person threatened, the *injury* threatened, as was, in effect, said by the learned district court, must be, in itself, unlawful, irrespective of whether or not the purpose with which the threat is made is to obtain money to which the person threatening is not entitled. Section 520 of the Penal Code provides that the threat must be such as is mentioned in the preceding section, and the preceding section, in subdivision 1 (the

7 Cal. App.—24

only subdivision here applicable), says that the threat must be one "to do an *unlawful* injury to the person or property of the individual threatened, or to any relative of his, or member of his family." The word "unlawful," as used in this statute, qualifies the word "injury," alone. If the injury threatened to property is one which the person threatening has an absolute legal right to do, he cannot be held to have threatened "to do an unlawful injury" to the property, even though his motive in making the threat is to obtain from the person threatened money to which he is not entitled, and, consequently, it cannot be held to be an injury within the provisions of sections 519 and 520 of the Penal Code. The statutory provision is so clear in this respect that no room is left for other construction. This conclusion is strengthened by the distinction between said subdivision 1 of section 519 and each of the other subdivisions of that section, wherein the element of unlawfulness of the act threatened is omitted. That this is the proper construction of the law under consideration was fully recognized by the court of appeals of New York in considering a precisely similar provision of the Penal Code of that state, in a case much relied on by the respondent. (*People* v. *Hughes,* 137 N. Y. 37, [32 N. E. 1105].)

What is meant by the term "unlawful injury"? Giving to such term the broadest meaning possible under the authorities, it can include no injury that is not of such a character that, if it had been committed as threatened, it would have constituted an actionable wrong, an injury for which an action for the resultant damages could be maintained against the defendant, or which, if merely threatened, could be enjoined in equity if the remedy at law were deemed inadequate.

Applying this to the case at bar: It was within the lawful power of the police commissioners of San Francisco to withhold from the restaurant-keepers a license to sell liquors at retail in their restaurant, no matter how great the pecuniary loss thereby caused to the business. It was also lawful for any person, by legitimate persuasion or argument, to endeavor to prevail upon the commissioners to refuse the license, although such person was actuated by a malicious intent to injure the restaurant-keepers and cause them pecuniary loss. The conjunction of the lawful persuasion inducing the lawful refusal of the license with the malicious motive instigating the persuasion, would not convert the lawful act of refusing

the license into an unlawful one, nor make the resulting injury unlawful or actionable. In order to make an injury from the lawful act of a third person a cause of action against the person inducing the act, such act must be procured by some means which the law denounces as unlawful. We think a review of the authorities satisfactorily shows that the means employed must be something which the law considers sufficient to take away the free consent of the third person, in this case the police commissioners, to the act which causes the injury, the consent essential to the validity of a contract. The means referred to are thus enumerated in section 1567 of our Civil Code: "An apparent consent is not real or free when obtained through: 1. Duress; 2. Menace; 3. Fraud; 4. Undue influence; or 5. Mistake." A contract obtained by such means is declared to be voidable. If A, by such means, induces B to do a lawful act injuring the property of C, an action will lie by C against A, for the damage thereby caused. But if A merely persuades or advises B to do the injurious act, no action will lie against A in favor of C.

We are not here speaking of an act unlawful in itself, in which case A might be liable as an accomplice. We refer to acts by B which, though injurious to C's property, are lawful in character, but which he would not have done but for the unlawful means used by A upon him.

The difference between an unlawful injury and an act which, though morally wrong and in fact injurious, does not furnish legal grounds of action, is illustrated by the two cases of *Boyson* v. *Thorn*, 98 Cal. 578, [33 Pac. 492], and *People* v. *Hughes*, 137 N. Y. 37, [32 N. E. 1104].

In *Boyson* v. *Thorn*, Boyson and his wife were lodging at the Palace Hotel. Thorn, maliciously intending to injure Boyson in person and property, induced Newlands, the proprietor of the hotel, to eject Boyson and his wife from the hotel, whereby Boyson sustained damage. This was done without the use of duress, menace, fraud, deception, or undue influence upon Newlands, the only means alleged being lawful advice and persuasion with malicious intent. It was held that no unlawful injury had been committed by Thorn upon Boyson, the reason being that the means used to induce the injurious act of Newlands were not unlawful in character, and that the malicious use of lawful means to induce a lawful act did not make the resulting injury unlawful.

In *People* v. *Hughes,* the defendant was the head of a labor organization, known as the Knights of Labor. Adler & Bros. were engaged in selling goods at wholesale and the success and profit of the business depended on the patronage of retail dealers in the same goods. The firm had disregarded a request of the order, made through Hughes, to employ only a specified number of apprentices, and the order, for that cause, acting through Hughes and by means of its influence over the retailers arising from the fact that its members were numerous and were consumers of large quantities of the goods, had caused a boycott by the retailers against Adler & Bros. Thereupon, Adler & Bros. removed the cause of the boycott by reducing the number of their apprentices to the desired number and apologized to Hughes for their previous disobedience. Hughes then threatened that, notwithstanding this compliance, unless a certain sum of money was paid him, he could and would induce the retailers to continue the boycott, that he would do this by deception in concealing from the order the fact that the cause of the boycott had ceased to exist and by means of his power as head of the order and the influence of the order which he could by that means bring to bear upon the retailers; that is to say, that he would induce the retailers to commit the injury, by means of his deceit, fraud and undue influence. The court says that the retailers had the lawful right to withdraw their custom and Hughes had the lawful right by proper means to induce them to do so, but that this was a threat of an unlawful injury to property because of the unlawful means proposed to be used— that is, the deceit and undue influence.

The question whether malice alone should be considered in law as sufficient to make an injury resulting from a lawful act the subject of an action for redress, or whether the use of unlawful means to induce the lawful act is essential, is a question of public policy. Both are morally wrong and the reason for the distinction is not to be found in the difference in the moral qualities of the respective elements. It is founded upon the conviction that to hold the former sufficient would, in the administration of the rule, cause injustice to be done more frequently than justice, and that it would be unwise to hold a man answerable in an action, solely because of the state of his mind, emotions and feelings. In many of the cases where an injury from the lawful act of a third person has been de-

clared unlawful there is no discussion of this phase of the subject, and frequently the elements of menace and undue influence are confused. But in nearly all of them, indeed in most of those exceptional cases in which malice alone has been held to make the injury unlawful, it will be found that the defendant employed some one of the unlawful means above mentioned in procuring the act to be done, or that he threatened so to do. For citations to cases on the subject, see 18 Am. & Eng. Ency. of Law, 88; 19 Am. & Eng. Ency. of Law, 626; 16 Am. & Eng. Ency. of Law, 1113; 1 Cyc. 651, 663, 669; 1 Cent. Dig., col. 1110. See 8 Harvard Law Review, pp. 1 to 14.

In this case the indictment charges that the defendant threatened the restaurant-keepers that, if money was not paid him, he would prevent them from obtaining or receiving a retail liquor license, and thereby destroy or render unprofitable their restaurant business, of which the sale of liquors at retail formed the remunerative part. It is not stated how the defendant proposed to do this, or how it was understood by the parties that he would accomplish it, whether by fair persuasion and lawful influence over the commissioners, or by duress, menace, fraud, or undue influence exercised upon them. This is not a case where it is sufficient to charge an offense in the language of the statute defining it. The court cannot assume, in the absence of any averment to that effect, that Schmitz was mayor of the city and as such in a position to exercise power and undue influence over the members of the board of police commissioners, or that Ruef, his codefendant, was a person in practical control of the city government because of his political activity and influence, or otherwise able to exert an undue influence over the board, nor can it be inferred, or presumed when it is not so charged, that the defendant threatened to prevent the issuance of the license by unlawful means, and not solely by lawful and innocent persuasion and argument. It may well have been the case that the threat made did not express in words any intent or purpose to use any of the unlawful means referred to, and yet that the purpose and ability to use such means successfully were perfectly understood by the parties concerned, because of the circumstances known to them. This absence of express avowal would not obviate the necessity of pleading the facts necessary to make the threat criminal.

It is an elementary principle of criminal law that the indictment must show that a crime has been committed. "In no case can the indictment be aided by imagination or presumption. The presumptions are all in favor of innocence, and if the facts stated may or may not constitute a crime, the presumption is that no crime is charged." (*People* v. *Terrill,* 127 Cal. 100, [59 Pac. 836].)

It should be added that neither of the two New York cases strongly relied on by the respondent (*People* v. *Hughes,* 137 N. Y. 37, [32 N. E. 1104], and *People* v. *Barondess,* 133 N. Y. 649, [31 N. E. 240]), involved any question of the sufficiency of an indictment, and that there is nothing in the opinions in said cases that is in conflict with the views we have expressed.

The attorneys for the respondent base their application for a hearing in this court solely upon the alleged errors of the district court in refusing to dismiss the appeal and in holding the indictment to be insufficient, and expressly limit such application to these two points.

They introduce their application with the statement that they are convinced that upon a full discussion of the case "it will be found and decided by this court that levying blackmail upon licensed businesses by the mayor and the political boss of a metropolitan community is a crime under the law of California, and should not go unwhipped of justice." This is a gross misstatement of the case and of the question to be decided, as presented by the indictment. We again emphasize the fact that the indictment does not aver that Schmitz was mayor, or that Ruef was a political boss, or that either of them had any power, or influence, or control over the police commissioners, or that they threatened to use such power, influence, or control in preventing the issuance of a license.

The question whether or not the fact, if it be a fact, that the restaurant-keepers were unfit persons who should not have been licensed, would be a good defense to a good indictment for extortion, is also a question foreign to the discussion of the sufficiency of the indictment. Any intimations in the opinion of the district court of appeal that such unfitness would justify the extortion of money by a threat of the use of unlawful means to procure the refusal of a license, must be considered as *obiter dicta,* and we do not wish to be understood as approving them.

The application for a hearing and determination of this appeal by this court, after decision and judgment by the district court of appeal of the first district, is denied.